25

obligation.

Q.    Did Emily disclose whether or not any other sex acts occurred between her and the suspect?

A.    She did.

Q.    Can you please tell the grand jurors about that?

A.    She told me that, during the last month or so, she had performed oral sex on him in a vehicle three times.

Q.    And did she indicate whether or not that was in exchange for heroin?

A.    She did.  She said basically Longhini would make her suck on his penis on the way to go get drugs.

Q.    And she indicated that she performed oral sex on him in the vehicle on three separate occasions?

A.    Yes, ma'am.

Q.    And she said that that was on the way to get dope or heroin?

A.    Yes, ma'am.

Q.    Did she indicate that he would withhold the heroin if she would not perform the oral sex?

A.    She did.

Q.    And after she performed the oral sex, he would then provide her with the heroin?

A.    Yes, ma'am.

26

Q. Once again, the suspect was interviewed in this case. Did he -- was he questioned in regard to whether Emily had ever performed oral sex on him?

A. He was.

Q. And what did he say?

A. He admitted that she had performed oral sex on him on multiple occasions in the car and estimated that it had happened approximately three times.

Q. Did Emily disclose whether any other sex acts occurred between her and the suspect?

A. Yes, she did.

Q. Can you please tell the grand jurors about that?

A. She told me that she was in the passenger's seat of his vehicle and that he reached over and inserted his fingers into her vagina.

Q. And just to clarify, Detective, you said "she told me." Were you the person interviewing Emily or were you just observing the interview?

A. I apologize. I was observing the interview from another room.

Q. But she told the interviewer that he reached over and inserted his fingers into her vagina?

A. She did.

Q. Did she tell him to do this or give him any

MARICOPA COUNTY SUPERIOR COURT

27

sort of permission to do this?

A.   No.

Q.   In fact, what was her reaction when he did this?

A.   She was surprised and told him to stop, which he did.

Q.   Did she indicate when this occurred?

A.   She said it was just after her 16th birthday.

Q.   Once again, the suspect in this case was interviewed.  Was he questioned regarding this incident with Emily?

A.   He was.

Q.   And what, if anything, did he state?

A.   When he was questioned about it, he admitted that he did do it and stated that he stopped when she told him to.

Q.   Did Emily ever disclose seeing anything pornographic in nature while at the suspect's home?

A.   She did.

Q.   Can you please tell the grand jurors about that?

A.   She told me that he -- or she told us that he always had pornography playing on his laptop in his bedroom.

Q.   And it was pornography that she was able to

28

see?

A.    Yes, ma'am.

Q.    And on multiple occasions?

A.    Yes, ma'am.

Q.    Did Emily ever disclose if Mr. Longhini masturbated in front of her?

A.    She did.

Q.    Can you please tell the grand jurors about that?

A.    She told us that he masturbated in front of her intentionally and that she believed he enjoyed it, looking at her while he was doing it.

Q.    And I'm sorry.  Just to go back, I believe you stated that Emily had indicated that there was pornography playing on a laptop in Mr. Longhini's home on multiple occasions that she saw; is that correct?

A.    Yes, ma'am.

Q.    After -- on July 7th, when Emily and Mr. Longhini were both contacted, was a search ultimately conducted on Mr. Longhini's home?

A.    Yes, ma'am.

Q.    During that execution of the search warrant, was a laptop found in Mr. Longhini's home or in his room?

A.    Yes, ma'am.

MARICOPA COUNTY SUPERIOR COURT

29

Q.    Has that laptop yet been analyzed to determine if there is anything of a pornographic nature on it?

A.    Not yet.

Q.    But there was a laptop that was located?

A.    Yes, ma'am.

Q.    After Emily participated in the interview, did she participate in a SANE examination, or a sexual assault examination by a nurse?

A.    She did.

Q.    And then I believe you said that Abigail Pierce was also interviewed in relation to this?

A.    Yes, ma'am.

Q.    And did she disclose any incidents that happened between her and Mr. Longhini?

A.    She did.

Q.    Could you please tell the grand jurors about that?

A.    Abigail stated that she would sell meth for Longhini in order to get heroin from him.

Q.    And that happened on multiple occasions?

A.    It did.

Q.    And did she indicate whether or not Mr. Longhini ever injected her with heroin?

A.    She did.

MARICOPA COUNTY SUPERIOR COURT

Q.    Can you please tell the grand jurors about that?

A.    She stated that Longhini began injecting her in November of 2015 and stopped in March of 2016 and estimated that the total number of times that she was injected was around 50.

Q.    And again, the suspect was interviewed in this case.  In his interview, did he admit to injecting Abigail Pierce?

A.    He did.

Q.    In addition to injecting Abigail Pierce with heroin, did Abigail Pierce disclose anything else in her forensic interview involving illicit drugs?

A.    She did.  She stated that Longhini injected her with meth approximately 20 times, but meth wasn't her favorite drug, and she stated she was 15 years old when she was injected with meth.

Q.    Did Abigail Pierce disclose anything else that happened with Mr. Longhini?

A.    She did state that, at one point, Mr. Longhini exposed his penis to her.

Q.    And did she disclose anything else that happened with Mr. Longhini?

A.    She said that she walked in on him masturbating and using tools on himself.

31

Q. And again, a search warrant was conducted of Mr. Longhini's home. Did the search warrant reveal any sex tools or sex devices consistent with Abigail Pierce's disclosure?

A. Yes, ma'am.

Q. Then I believe you said that Madeline Pierce was also interviewed?

A. Yes.

Q. And did she involve any incidents that occurred with Mr. Longhini?

A. I'm sorry. Can you repeat the question?

Q. Of course. Did Madeline Pierce, or Maddy Pierce, disclose any incidents in that interview that occurred with Mr. Longhini?

A. She did.

Q. And could you please tell the grand jurors about that?

A. She stated that she was introduced to Longhini by her two twin sisters in January of 2016 and that all three of them would go to Longhini's house and use drugs.

Q. And did she indicate a first time -- or talk about a first time that Mr. Longhini would have given her methamphetamine?

A. She did.

Q.    And what did she state?

A.    She said the first time that Longhini gave her meth was in a glass smoking pipe and, basically, he loaded the bowl and lit it for her because she didn't know how to do it.

Q.    Did she indicate whether or not he ever injected her with methamphetamine?

A.    She did.

Q.    And could you please tell the grand jurors about that?

A.    She said the first time that she injected methamphetamine, Longhini injected her because she didn't know how.  She said that he injected the meth into her arm while she was holding her sister Emily's hand because she was scared and she said it hurt and burned when it was injected into her arm.

Q.    Did Madeline indicate whether Mr. Longhini injected her one time with methamphetamine or more than one time?

A.    She stated that Mr. Longhini injected her many times, sometimes multiple times a day, and she estimated that she was injected around 50 times total in a three-week period.

Q.    Did she indicate her age during this time period?

33

A.     She said she was 17 at the time.

Q.     And once again, the suspect was interviewed in this case.  Was he questioned regarding Madeline?

A.     He was.

Q.     And what did he indicate?

A.     He admitted to knowing Madeline and admitted that she had come over to his house to get meth.

Q.     And then, finally, you indicated that a Micayla Spangler was interviewed relating to the suspect.  Did she disclose any incidents involving herself and Mr. Longhini?

A.     She did.

Q.     Could you please tell the grand jurors about that?

A.     She stated that she met Longhini when she was 15 and she stated that Longhini gave her meth about 10 times.  He wouldn't inject her.  He would just give her the drugs.

Q.     Did she ever disclose him giving her any other drugs besides methamphetamine?

A.     She did.

Q.     Could you please tell the grand jurors about that?

A.     She stated Longhini gave her heroin four times.

MARICOPA COUNTY SUPERIOR COURT

34

Q.    Did she disclose whether she ever witnessed Longhini interacting with any of the other girls?

A.    She did.  She stated that she saw Longhini inject Maddy with meth on one occasion.

Q.    Did Micayla disclose any other incidents that happened between her and Mr. Longhini?

A.    She did.

Q.    Could you please tell the grand jurors about that?

A.    She stated, when she was 16 years old, her and her boyfriend went to Longhini's house and he exposed his penis to both of them.

Q.    And again, I believe you disclosed or described that, after Mr. Longhini was interviewed and at least after Emily was interviewed, if not some of these other girls, at some point in time, a search warrant was conducted on Mr. Longhini's home; is that correct?

A.    Yes, ma'am.

Q.    Was it determined which room within the home was Mr. Longhini's?

A.    Yes.

Q.    In that room, based on your training and experience, were items that could be used for purposes of drug use located?

MARICOPA COUNTY SUPERIOR COURT

35

A.    Yes, ma'am.

Q.    Could you please tell the grand jurors about that?

A.    There was a large quantity of hypodermic needles and a digital scale found.

Q.    In Emily's interview, did she also talk about Longhini having scales and needles that he would use to help inject her with heroin?

A.    She did.  She specifically said that several of the needles used on her were on the floor.

Q.    After Mr. Longhini was interviewed, was he subsequently arrested and taken to jail?

A.    He was.

Q.    And once in jail, was he able to make calls from jail?

A.    He was.

Q.    Now, can you explain to the grand jurors, when a call is made from jail, are those calls recorded?

A.    They are.

Q.    And every time a call is made from jail, is some sort of automation or warning given to that person that's making the phone call to alert them to the fact that that phone call is being recorded?

A.    Yes, ma'am.

Q.    Between July 12th of 2016 and July 14th of

36

2016, did Mr. Longhini make multiple phone calls to his mother, a Karyl Bishop?

A. He did.

Q. And can you describe the relevant contents of those phone calls?

A. He basically gave his password to his Google account and asked his mom to contact Verizon and have the phone remotely erased, locked and then reported stolen.

Q. And where was the phone that he was asking to have erased or wiped and reported as stolen during these phone calls?

A. In the custody of the sheriff's office as evidence.

Q. And was this something that Mr. Longhini was aware of?

A. Yes. They discussed it on the phone.

Q. And did Mr. Longhini make some sort of statement to the fact of that, if the phone was wiped, that should, quote, remove their ability to have a case against me?

A. He did.

Q. Did Ms. Bishop actually contact Verizon and attempt to report the phone -- Mr. Longhini's phone as stolen to have it wiped?

37

A.    She did.

Q.    And how were you able to confirm that or how did you investigate that?

A.    I sent a court order to Verizon asking for account notes and, in the notes, it indicated that she called in.

Q.    And it indicates that Karyl Bishop called in and then reported that phone as stolen?

A.    Yes, ma'am.

Q.    At some point, does that interaction between Mrs. Bishop and the Verizon employee get disconnected?

A.    Yes, ma'am.  The Verizon employee accessed the phone to wipe it remotely and, before doing so, the phone call got disconnected.

Q.    After that phone call got disconnected, do the Verizon notes then show that that account -- that same account was accessed through a desktop and then some sort of tablet device in an attempt to report it stolen?

A.    Yes, ma'am.

Q.    In a review of further jail calls, does Ms. Bishop call back and confirm that she did, in fact, contact Verizon to report it stolen?

A.    He contacted her.  It's only one-way, our phones, but, yeah, she did tell him that.

38

Q.    Thank you for that clarification.  Next time, or at some point later when Mr. Longhini is again speaking with Mrs. Bishop, or Ms. Bishop, she confirms that she did, in fact, contact Verizon to report the phone stolen?

A.    Yes, ma'am.

Q.    All of the victims in this case -- Emily, Abigail, Micayla, and Madeline -- reported incidents that occurred between Mr. Longhini and themselves between the times when they were at least 15, but under the age of 18; is that right?

A.    Yes, ma'am.

Q.    And all of these incidents happened in Anthem which is in Maricopa County?

A.    Yes, ma'am.

MS. GRAY:  I don't believe I have any further questions.  Thank you.

MR. MOORE:  Any questions from the grand jury?

JUROR ███:  What's Mr. Longhini's age?

THE WITNESS:  I believe he is currently 30.

JUROR ███:  Did he have any reason to believe -- did he know how old the girls were at the time?

THE WITNESS:  Yes.

MARICOPA COUNTY SUPERIOR COURT

JUROR ████: Okay.

MR. MOORE: Other questions?

THE GRAND JURY PANEL: (No oral response.)

MR. MOORE: All right. Hearing no further --
did you have a question?

JUROR ████: Yes, I have one question.
Did the parents report these kids missing or were they
missing? What was the deal? Why was he keeping them
and nobody knew they were missing? Nobody ever reported
it? I don't know. I'm asking if anybody --

MR. MOORE: Go ahead and answer.

THE WITNESS: They were reported missing in
the system.

JUROR ████: Okay.

MR. MOORE: Any other questions?

THE GRAND JURY PANEL: (No oral response.)

MR. MOORE: Hearing no further questions,
Detective, you're admonished that Arizona law prohibits
you from discussing your testimony here today with
anyone other than the prosecution. Please have a seat
outside.

THE WITNESS: Thank you, sir.

(Witness excused.)

THE COURT: All right. Do we have any legal
issues?

JUROR █████████:    Is the prostitution charge where he would give them the drugs in exchange for the sex act?

MS. GRAY:  That's how it's charged, yes.

MR. MOORE:  That's the State's position. It's up to you guys to decide.  Any other questions?

JUROR ██████:  Actually, one:  Since he is actually trading kind of drugs for sex, I don't remember -- there were quite a few cites mentioned here. Was he charged with selling drugs?

MS. GRAY:  That's not one of the -- not one.

MR. MOORE:  Are you referring to involved or using minors in a drug offense?

JUROR ██████:  No.  Just the sale of narcotics or dangerous drugs.

MR. MOORE:  You're asking whether or not that could be charged?

JUROR ██████:  Yeah, like 3407 or 3408 or something like that.

MR. MOORE:  That's up to the grand jury.  If you guys wish to review that, look at 13-3407, 13-3408. Those are the two main types of drugs that are involved here, both dangerous drugs and narcotic drugs.  And then you'd need to look at 13-3401 through -- in addition to that and decide if you think that that should be added.

MARICOPA COUNTY SUPERIOR COURT

41

JUROR ▉: Thank you.

MR. MOORE: Any other questions?

THE GRAND JURY PANEL: (No oral response.)

MR. MOORE: Hearing no further legal issues, please deliberate and determine which of your options you wish to pursue.

(Whereupon, the Deputy County Attorney and the court reporter were excused from the Grand Jury room, were subsequently recalled into the Grand Jury room, and the following proceedings were had:)

MR. MOORE: There was an omission just realized about potential further information that should have been provided to you.

And indicate what count that might go to.

MS. GRAY: Potentially relating to Count 28.


JOHN GRAHAM, called as a witness herein, having been previously duly sworn, was examined and testified further as follows:


E X A M I N A T I O N   (Resumed)

BY MS. GRAY:

Q.   Detective, I failed to ask you, did -- during Abigail's interview, did she ever indicate an incident in which the suspect attempted to take her -- remove her

MARICOPA COUNTY SUPERIOR COURT

42

clothing while she was unconscious?

A.    Yes.

Q.    Can you please tell the grand jurors about that?

A.    Abigail stated, at one point when she woke up at his house, she woke up to him attempting to take her pants off.

MR. MOORE:  Any questions about that?

THE GRAND JURY PANEL:  (No oral response.)

MR. MOORE:  That all -- is that the information you wish --

THE WITNESS:  Yes, sir.

BY MS. GRAY:

Q.    Only to follow-up, the suspect was interviewed in this case as well.  Was he interviewed specifically relating to that incident?

A.    No, ma'am.

Q.    But did he admit to engaging in sexual acts with Abigail?

A.    He did.

MS. GRAY:  I have no further questions.

JUROR ███  I have a question.  What date was that?

BY MS. GRAY:

Q.    Did Abigail indicate that that would have

MARICOPA COUNTY SUPERIOR COURT

43

been --

JUROR ▮▮▮▮: That he was interviewed and what date was that one?

BY MS. GRAY:

Q. What date was he interviewed?

A. July 7th, 2016.

JUROR ▮▮▮▮: That was the first time he had been interviewed --

THE WITNESS: Yes.

JUROR ▮▮▮▮: -- in all of this?

BY MS. GRAY:

Q. And just to clarify, has Mr. Longhini only been interviewed once in relation to this case?

A. In relation to this case, yes.

JUROR ▮▮▮▮: What was the 2008 date? This starts at 2008.

MR. MOORE: 2013.

JUROR ▮▮▮▮: There was nothing in 2008?

JUROR ▮▮▮▮: I thought the mother was contacted around 2014 or something like that.

MS. GRAY: The mother?

JUROR ▮▮▮▮: One of the girls' mother was contacted, in the beginning of your testimony.

MS. GRAY: Sure. That's a separate count relating to Emily.

44

JUROR ▌: And he was — he was interviewed at that time?

BY MS. GRAY:

Q. Was Mr. Longhini interviewed relating to the attempted sexual assault of Emily?

A. Yes.

Q. Previous to the interview that we're talking about now?

A. No.

JUROR ▌: Okay.

MS. GRAY: Does that help clarify your answer?

JUROR ▌: So there was — there was — she notified the police — the mother notified the police back in 2014, but he was never interviewed?

THE WITNESS: That's correct.

JUROR ▌: Hmm. That's interesting.

MR. MOORE: He was only interviewed on July 7th?

THE WITNESS: Yes, sir.

MR. MOORE: Does that help?

JUROR ▌: Yeah. I just wanted to clarify that she had contacted the police to say that her daughter had been almost sexually abused or sexually abused back in 2014, but he was never interviewed?

MARICOPA COUNTY SUPERIOR COURT

45

THE WITNESS:  Right.

MR. MOORE:  Any further questions?

THE GRAND JURY PANEL:  (No oral response.)

MR. MOORE:  Hearing no further questions, please deliberate or continue to deliberate as to which of your options you wish to pursue.

(Whereupon, the Deputy County Attorney and the court reporter were excused from the grand jury room, were subsequently recalled into the grand jury room, and the following proceedings were had:)

JURY FOREPERSON ▮▮▮▮:  The jury has voted and directs the County Attorney to prepare a draft indictment for our consideration.

MR. MOORE:  And the County Attorney has prepared draft indictments for your consideration.  Now, please keep in mind all those admonitions concerning draft indictments.

(Whereupon, the Deputy County Attorney and the court reporter were excused from the Grand Jury room, were subsequently recalled into the Grand Jury room, and the following proceedings were had:)

JURY FOREPERSON ▮▮▮▮:  Would the clerk read the grand jurors' findings.

JUROR ▮▮▮▮▮:  The grand jury, with 14 members present and only members of the grand jury

MARICOPA COUNTY SUPERIOR COURT

46

present, deliberated upon evidence and, with 14 jurors voting by a vote of 14 to zero, returns a true bill.

MR. MOORE: That will conclude not only this case, but the rest of the day. And guess what, judge is outside, ready to come in and do returns.

(A recess was taken. The following grand jurors were present for returns: GRAND JURY FOREPERSON ███████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████.

Whereupon, COMMISSIONER JUSTIN BERESKY, DEPUTY COUNTY ATTORNEY WILLIAM MOORE and COURT CLERK LESLIE CODY-DAY entered the grand jury room and the following proceedings took place:)


R E T U R N   O F   I N D I C T M E N T

JURY FOREPERSON ███████: Your Honor, Case 679 GJ 284, a true bill. My signature appears on the indictment endorsing it a true bill.

MR. MOORE: Your Honor, there are two suspects here. As I understand it, the suspect with the initials "EL" is an NSI. Do you see that?

THE COURT: Yes.

MR. MOORE: Okay. As for the suspect with

47

the initials "KB," that is a summons.

THE COURT:  It is ordered that a summons shall issue as to Defendant KB, as in boy; and a notice of supervening indictment as to Defendant EL.

(Proceedings concluded.)

48

C E R T I F I C A T E

I, Barbara H. Stockford, court reporter herein, hereby certify that the foregoing is a true and accurate transcript of the proceedings here, all done to the best of my skill and ability.

DATED this 10th day of October 2016.

Barbara H. Stockford, RMR/CRR/CRC
Arizona CR No. 50463

MARICOPA COUNTY SUPERIOR COURT

EXHIBIT FOUR (4)



**DOUGLAS A. COL, Ph.D.**
*Clinical Psychologist*
License #1346

**CONFIDENTIAL**
**Professional Use Only**
**Not Intended For Direct**
**Dissemination To Client**

349 E. Main Street, #3
Ashland, Oregon 97520
Telephone: (541) 488-2855

## Psychodiagnostic Testing Evaluation

*The information contained in this report is of a very sensitive nature. The specific personality variables, scores, and ratios are intended for use by qualified professionals only. The only appropriate format for the release of this information to the individual being evaluated is as a very general description of the findings. Specific personality descriptions, testing scores, and ratios should not be released to the client under any circumstances without the prior approval of the clinical psychologist who prepared this report.*

**Name:** Joe Bishop

**Date:** 9/12/01

**Identifying Information:** Joe is a 15-year-old Caucasian adolescent male, tall and weight proportionate, with no obvious health problems or limiting physical conditions.

**Reason for Referral, and Source:** Joe was referred for comprehensive diagnostic testing by his mother, Erin Bishop, in the effort to determine what might be causing his substantial social, behavioral, and academic problems.

**Assessment Instruments Used:**
Coding, Symbol Search, and Mazes subtests from the Wechsler Intelligence Scale for Children, Third Edition (WISC-III)
Bender Visual-Motor Gestalt Test (Bender Gestalt)
Hooper Visual Organization Test (Hooper VOT)
Trail Making Tests A & B
Grooved Pegboard
Rey Complex Figure Test (RCFT)
d2 Test of Attention
Stroop Color and Word Test
Wisconsin Card Sorting Test (WCST)
IVA Continuous Performance Test
Millon Adolescent Clinical Inventory (MACI)
Rorschach Inkblot Test
House-Tree-Person Drawing Test (H-T-P)
Review of neuropsychological testing done by Michael Villanueva, Psy.D. Tests given by
  Dr. Villanueva on 8/3/98 included:
    Wechsler Intelligence Scale for Children, Third Edition (WISC-III)
    Wide Range Achievement Test, Third Edition (WRAT-3)
    Wide Range Assessment of Memory and Learning (WRAML)
    Token Test for Children

Grooved Pegboard
TOVA
Trail Making Tests A & B for Children
Review of a comprehensive psychological evaluation and behavioral testing by Mark Tapley, a
 School Psychologist for Jackson County ESD, on 4/7/99. Tests given by Mr. Tapley to Erin's
 mother and teachers included:
 Behavioral Assessment System for Children (BASC)
 Burks' Behavior Rating Scale (Burks')
 Child Behavior Checklist (CBCL)
Results of Woodcock-Johnson Tests of Achievement (Standard and Supplementary), performed
 by the Eagle Point School District on 9/20/99.
Clinical Interview

**Medical and Psychosocial History:** Joe's history has been recounted several times in past
reports, and will not be repeated in full at this time. Suffice it to note that, from a medical
perspective, he has a history of a reported stroke at birth, a very low Apgar score, and poor
postpartum muscle tone, speed, and strength. He reportedly continued to have weakness and
ataxia in the upper and lower extremities on the left side, and had a significant tendency to fall to
the left when walking when he was young. He was labeled as being developmentally delayed or
retarded early in his life, and has had brain imaging studies that have been reported to indicate
some sort of cerebral lesion in the right posterior portion of his brain. When he was six weeks
old Joe reportedly contracted systemic viremia, which generated a sustained high fever.

In terms of his psychological functioning, Joe has reportedly had social problems since his
preschool years, and received counseling for some of these problems when he was between the
ages of three and seven. He has had periods of home schooling when social discord at school
made public schooling unfeasible. In the recent past he has experienced some serious conflicts
with his teachers, and saw his grades fall significantly during the spring school term of this past
academic year. He is currently suspended from school because of some kind of altercation or
misunderstanding that occurred on the first day of school this fall, and he may end up being
expelled from school as a result.

**Clinical Observations:** Joe was fully cooperative with all aspects of testing. His speech was
normal in rate, rhythm, and tone, with no evidence of tangential or circumstantial thought. He
did not admit to any bizarre perceptions, illusions, delusions, or hallucinations. He was well
oriented to time, place, and self, and was able to pay attention and stay on-task for sustained
periods of time. His general fund of knowledge was within normal limits, and his insight and
judgment appeared grossly intact. No significant fluctuations or dissonances were noted in his
mood or affect. He appeared to give his best effort on all tasks, and the current measures of his
abilities, strengths, and weaknesses appear to be both valid and accurate.

**Test Results:** On Dr. Villanueva's testing in August of 1998 Joe achieved a Verbal Scale IQ
(VIQ) of 106, a Performance Scale IQ (PIQ) of 91, and a Full Scale IQ (FSIQ) of 99 on the

WISC-III. This placed him in the Average range of overall intellectual functioning. His testing results appeared to be both valid and accurate, but the 15-point discrepancy between his VIQ and PIQ scores was possibly clinically significant. As Dr. Villanueva noted in his report, such a discrepancy is suggestive of damage to the right cerebral hemisphere, and often correlates with difficulties in social relations.

In Dr. Villanueva's testing Joe produced a Coding subtest scaled score of only 5, which in a child of Joe's overall intelligence is suggestive of some sort of significant organic damage and often correlates with difficulties in social relations. In order to determine whether such a score might have been a testing anomaly the subtest was re-administered by this author. While Joe was able to produce a marginally better raw score in present testing, his scaled score was actually lower than before because of the age norms that are used to determine scaled scores. The Symbol Search subtest from the WISC-III was also given, so that a Processing Speed Index (PSI) could be calculated. Joe's PSI was only 83, which was significantly low and suggested that he has real difficulties with processing speed for complex tasks. Unfortunately, difficulties with processing speed can often lead to problems with social relations, since timely and accurate responses are needed for smooth social interactions.

Interestingly, although Joe has been diagnosed with an Attention-Deficit/Hyperactivity Disorder, he had a Freedom from Distractibility Index score of 112 on the WISC-III, suggesting that he may have few real problems with working memory, attention, or concentration. However, he did much more poorly on a current administration of the WISC-III Mazes subtest, where he was only able to achieve a scaled score of five. Again, this is a serious deficit that seems to indicate problems with the modulation of his motor impulses. In order to ensure that Joe's poor Coding and Mazes subtest scores were not due to a visual processing problem, the Hooper Visual Organization Test was also given. Joe's score on this instrument indicated that he has no real problems with his visual organization or processing.

On a WRAT-3 that was administered by Dr. Villanueva in 1998 Joe produced robust scores that ruled out any possibility of a learning disorder. These results were generally consonant with his performance on a Woodcock-Johnson battery that was administered by the Eagle Point school system a year later. The only exception to this statement is that Joe's performance on the Woodcock-Johnson did identify some weaknesses in the area of visual pattern recognition and phonetic/semantic closure. However, in virtually all other areas of academic functioning Joe exceeded what would be predicted from his Full Scale IQ score, often attaining scores that were in the Superior range.

Much of the testing that was done by Mr. Mark Tapley of Jackson County ESD appears to have been conducted in order to determine whether the psychostimulant medication that Joe had been given after his testing with Dr. Villanueva was having any kind of positive effect. This testing seemed to suggest that the medication—Adderal—was having a salutary effect by decreasing Joe's general impulsivity, inattention, and potential for aggression towards others. No

improvement was noted in Joe's problems with social functioning after stimulant medication had been started.

Because of his history of a possible Attention-Deficit/Hyperactivity Disorder, the IVA Continuous Performance Test was administered by this author in the effort to detect both gross and fine motor hyperactivity, and inattention in both the visual and auditory realms. All testing was done during a summer-long stimulant medications "holiday," during which Joe took no medications. On the IVA Joe showed very clear signs of ADHD, Primarily Inattentive Type, but only in the auditory realm; very few signs of problems with visual attention or concentration were noted. To be more specific, Joe appeared to have very serious problems with his discriminatory auditory attention and vigilance, and to be extremely slow in responding to auditory stimuli, suggesting that he may have some serious problems with the efficiency of his auditory processing. He also seemed to have a very hard time maintaining his auditory attention, and was slightly slowed in his ability to make motor responses to auditory stimuli. In the visual realm, Joe showed fairly mild signs of a tendency to fatigue when presented with repeated visual stimuli, to be somewhat slow in responding to visual cues, and to have a need for some "recovery time" between successive visual stimuli. He also showed a very strong preference for visual over auditory stimuli, and tended to be able to maintain his auditory attention only if he was continually stimulated by auditory inputs. It should be noted that some research has suggested that the kinds of attention problems that Joe demonstrated tend to respond better to antidepressant than stimulant medications, an idea that might be considered when contemplating medication changes or adjustments.

Interestingly testing with the Grooved Pegboard found that, contrary to Dr. Villanueva's results, Joe currently has no real problems with his rapid motor dexterity or coordination. Similarly, he showed none of the signs of difficulties with rapid seriation, set shifting, or parallel processing that were seen by Dr. Villanueva on the Trail Making Tests A & B. Few signs of problems with rapid verbal fluency, even with interfering stimuli, were seen on the Stroop Color and Word Test, and he generally did well on the d2 Test of Attention, which monitors a person's capacity for sustained and detailed visual attention and concentration. However, the d2 Test did detect quite significant signs of poor discriminative impulse control. Joe demonstrated an entirely adequate capacity for visuospatial memory on the Rey Complex Figure Test (RCFT), but seemed to have some difficulties with the copying of the original stimulus figure, suggesting that he might have some problems with visuospatial processing, and/or copying abilities. The Wisconsin Card Sorting Test (WCST) found no signs of any kind of problem, suggesting that Joe has good capacities for abstract categorical thinking and fluid intelligence.

Testing with the MACI found very high levels of peer insecurity, which tended to confirm the hypothesis that Joe's large VIQ/PIQ discrepancy and his low WISC-III Coding subtest and Processing Speed Index scores could reflect some kind of organic deficit that is leading to serious problems with his social functioning. Problems with peer insecurity usually include general social awkwardness and hesitation, and longstanding efforts to keep other people, particularly one's peers, at a distance. Feeling threatened and potentially overwhelmed by his

interactions with others, Joe appears to have a self-defensive tendency to deny his own needs for interpersonal closeness and affection, while brooding over his social deficits, failures, and humiliations. Despite the fact that the MACI interpretive report suggested that Joe has "an unrequited need for personal acceptance," it appears that he has decided that it is safer to restrain this need and maintain a defensive distance from his peers. Ironically, such defensive distancing only tends to exacerbate his social rejection. In addition to his peer insecurities the MACI also found that Joe tends to be both inhibited and introverted, and to have problems with family discord, issues of sexual insecurity and/or discomfort, and poorly contained acting out tendencies. Rejecting meaningful interactions with his peers, he can either become lost in his "daydreams" or fantasies, or become distracted by his own ruminative and intrusive inner thoughts—possibly including worries over troublesome sexual impulses.

The Bender Gestalt found numerous signs of possible organic brain dysfunction, along with possible flattened affect and/or depression. There were indications that Joe can be insecure, timid, and fearful, and also inhibited and constricted. He appeared to have a low frustration tolerance, and to have real difficulties handling his own aggression. In trying to suppress his hostile impulses he tends to exert repressive controls over his feelings, which is only successful until his feelings and/or impulses break through and precipitate acting out behaviors. As on the MACI, there were signs on the Bender that Joe can be anxious about his virility and masculinity.

As did the MACI and the Bender Gestalt, the House-Tree-Person Drawing Test (H-T-P) found numerous signs of insecurity, inadequacy, and dependency, with low self-esteem and a tendency towards excessive defensiveness. On the H-T-P Joe appeared to be an inhibited, timid, shy, restrained, and constricted young man who turns into himself as a way of defending himself against feared environmental contacts and social relations. The result is a tendency towards self-absorption, as he seems to get much of his satisfaction through his fantasies rather than real-life contacts or events. He has strong withdrawal tendencies, and is often reluctant to face or communicate directly with others. Instead, he seems to be rigid and reserved in his interpersonal relations, with strong feelings of social inadequacy. He also has a strong need to maintain an acceptable façade in his interpersonal relations, while tending to lack enjoyment in such relations and to be dissatisfied with his interactions with others. He tends to be immature, to have regressive tendencies, and to have problems containing and controlling his frustration, anger, aggression, oppositionality, impulsivity, and emotional lability. He may have low levels of ego strength, and may experience feelings of sexual inadequacy.

The Rorschach offered more insight into Joe's problems by finding that he has a coping deficit, which leaves him vulnerable to becoming overwhelmed by the stresses of ordinary life. As with most people he tends to act out when he becomes overwhelmed, which can lead to inappropriate or ill-advised behaviors. The Rorschach also found that Joe seems to have significant levels of depression—*possibly with a potential for self-harm*—and to be experiencing either an organically or emotionally induced disturbance in his thought processes.

Perceptually, Joe has a very strong tendency to misperceive events and form mistaken impressions of people and what their actions mean. As a result he tends to be quite impaired in his social perceptions, quite vulnerable to misperceiving what other people are thinking or feeling, and to have little idea why they act in the ways that they do. It should be noted that both Joe's high levels of social dysfunction and his coping deficits could be due to the organic brain impairments that were suggested by his VIQ/PIQ discrepancy, his low Coding subtest and Processing Speed Index scores, and imaging evidence of right cerebral hemisphere brain damage. Unfortunately, Joe's tendencies to misperceive others, misjudge their motives, and engage in impulsive actions or reactions all combine to make him quite vulnerable to engaging in inappropriate social behaviors, and/or maladaptive social interactions.

Needing to protect himself from a world that he often finds either threatening or overwhelming, Joe has a strong tendency to narrow his focus of attention and close himself off to adequate levels of contact with the world around him. As a result he tends to either overlook or misperceive many of the nuances of social relations or interpersonal interactions, which makes it very difficult for him to behave in ways that are appropriate and to avoid getting himself into trouble. Again, it should be noted that his failure to perceive and/or recognize subtle verbal and nonverbal social cues might be a direct result of the diffuse damage that has reportedly been seen in his right cerebral hemisphere, suggesting that many of his problems with social relations and functioning could have an organic basis. In addition to his perceptual problems, he also has a tendency to arrive at decisions and engage in courses of action without giving them adequate reflection or thought. Combining his social/perceptual difficulties with his impulsivity, it is hardly surprising that he lacks good social skills and has very significant problems with his interpersonal relations.

Possibly because of his coping deficit Joe also has great resistance to processing emotional stimuli. In order to avoid such stimulation—which he may perceive as being potentially overwhelming—he tends to withdraw both socially and emotionally. Unfortunately, this only deepens his isolation and keeps him from being able to develop more adequate social skills. Joe also seems to exert very stringent control over his own feelings, which tends to make him emotionally reserved and limits his capacity for the free and spontaneous expressions of his emotions. As a result he tends to have difficulties relating to others on a casual or informal basis, making him even more awkward and exacerbating his levels of social dysfunction.

Having very low self-esteem and a very low estimate of his own personal worth, Joe lacks self-confidence and tends to judge himself quite unfavorably when he compares himself to others. In order to protect himself from these negative self-perceptions and judgments he tends to avoid meaningful self-awareness. Unfortunately, this defensive suppression of self-awareness only exacerbates his tendencies toward maladaptive social behaviors by preventing him from being able to see when he is acting inappropriately.

Overall Joe is quite clearly compromised in his capacities to manage his interpersonal relations in a comfortable or rewarding manner, to develop adequate social skills, or to be appropriate in

his social and interpersonal interactions. Because his lack of social skills and his inappropriate behaviors often either get him into trouble or lead to embarrassing, painful, or shaming interpersonal interactions, he tends to avoid most personally meaningful social relations. The result is a fairly limited capacity to form close attachments to others, with relations with others tending to be distant and detached rather than close-up and intimate. Not surprisingly, he tends to have less interest in other people than most young men his age, and to be emotionally withdrawn. He also has little expectation of engaging in fulfilling collaborative or competitive relations with others.

**Diagnostic Impression:**

| | | |
|---|---|---|
| Axis I: | 294.9 | Cognitive Disorder NOS, with a Prominent Disturbance of Social Relations |
| | 314.00 | Attention-Deficit/Hyperactivity Disorder, Predominantly Inattentive Type, Primarily in the Auditory Realm |
| | 300.4 | Dysthymic Disorder |
| | V61.9 | Relational Problems Secondary to Organic Brain Dysfunction |
| | | |
| Axis II: | V71.09 | No diagnosis on Axis II |
| | | |
| Axis III: | | History of stroke at birth, with reported imaging studies suggesting a lesion in the posterior portion of the right cerebral hemisphere. Also a history of systemic viremia at 6 months of age, with high fever. |
| | | |
| Axis IV: | | Conflicts with mother and rejection by biological father; few friends and chronic social dysfunction; multiple suspensions and threatened expulsion from school |
| | | |
| Axis V: | GAF 40 | Present |

**Summary and Recommendations:** Joe is an unfortunate young man who appears to have sustained some significant organic damage to his brain, with imaging studies reportedly suggesting damage to his right cerebral hemisphere. Diagnostic psychological and neuropsychological testing data seem to support this conclusion, confirming the behavioral observations of social inappropriateness and dysfunction. Projective testing found signs of a significant coping deficit and strong tendencies to misperceive both his environment and the people in it, with fairly predictable negative implications for his social interactions and functioning. Unable to understand the intentions, motivations, or actions of others, being either unwilling or unable to tolerate emotionally charged interactions with others, and defending himself against very low levels of self-esteem by avoiding meaningful self-awareness and withdrawing into a compensatory world of fantasy and possible grandiosity, it is hardly surprising that Joe has an exceptionally difficult time with his social interactions and interpersonal relations. When one adds to this both his considerable frustration and his real difficulties with impulse control, it is hardly surprising that he has a high potential for acting out

in socially inappropriate ways. However, his difficulties with social functioning should not be confused with either an Oppositional Defiant or Conduct Disorder, and need to be understood from the neuropsychological context in which they seem to be occurring. Joe tends to act out not because he is bad, or because he seeks to alienate others or get into trouble, but because he is lost and confused and has no better ways or coping skills for establishing meaningful contacts with others.

This fact needs to be kept in mind when one considers Joe's current difficulties with his school system. With regard to these difficulties the Oregon Department of Education's pamphlet *Parental Rights for Special Education (K-12): Notice of Procedural Safeguards,* dated September 1997, clearly addresses the issue of "longer removals" from school, which it defines as "expulsion and suspensions that add up to more than 10 days in a school year," by stating that "school districts cannot take this kind of action for misconduct that is a manifestation of the student's disability." The trick, of course, is to identify such disabilities so that they can be factored into a student's disciplinary and behavioral management program. In Joe's case there does not seem to be evidence, either in previous psychological evaluations or in his Individualized Education Programs, that the full extent of his disabilities—which may very well have an organic basis—have previously been either recognized or diagnosed. The lack of such previous diagnoses notwithstanding it is my opinion, after a careful analysis of previous reports, my own testing data, and detailed clinical interviews with Joe, that it is precisely his disabilities in cognitive and social functioning that have led to his current misconduct and disciplinary problems.

To be fairly specific regarding his previous IEP plans it appears that, rather than working to improve Joe's social skills and integrate him better into the school milieu, his plans have involved *removing* him from as many problematic social interactions as possible. Unfortunately, this only serves to exacerbate his isolation, reify his sense that he does not belong, and prevent him from learning how to interact more appropriately with others. Instead of marginalizing Joe in the attempt to modulate and gain control over his episodes of impulsive acting out, it would appear that efforts should be made to help him learn how to integrate himself more fully into the student milieu, while also helping him to understand that he has a very real, and possibly organically caused, set of cognitive processing and social skills deficits, and that he has a desperate need for both cognitive and social skills training. The key to all of this might be to understand that much of his social dysfunction, ineptness, and impulsivity quite possibly have an organic basis. His defensive bravado and grandiosity—and behind that his painful shyness, timidity, and desire to withdraw—should all be seen as reactions to his underlying cognitive and social deficits. What seem to be indicated for Joe are:

1) Possible antidepressant medications, both for his dysthymia and as a treatment for his problems with auditory attention;

2) Possible stimulant medications, in order to help him control his impulsivity;

3) Weekly counseling and social skills training outside of the school setting, both to help Joe learn how to deal with his underlying cognitive, attentional, and social deficits and to help him learn how to modify his maladaptive defensive compensations for those deficits;

4) Accommodations within the school setting for his auditory attention deficits; and

5) To be assigned a counselor/advocate within the school system who can help Joe:
   a) learn how to modify his behaviors so that he gets more positive social interactions and rewards;
   b) develop better coping strategies for getting his work done and in on time;
   c) develop better working relationships with his teachers;
   d) de-escalate social conflicts when they get out of hand; and
   e) learn to see how he often misreads cues and responds inappropriately when social interactions take a turn for the worse.

The process of implementing such interventions and accommodations should always be seen as a dynamic interchange, in which things will have to be tried and then modified until better results can be achieved. The kinds of deficits that Joe appears to have are not particularly easy to treat, and will need to be given ongoing attention and work in order to be addressed effectively.

Thank you for referring this most interesting young man. If you should have any questions about this evaluation, please feel free to contact me.


Douglas Col, Ph.D.
Licensed Psychologist

Case 2:24-cv-00785-DJH   Document 1-2   Filed 04/08/24   Page 35 of 52

BISHOP—p. 10

## Appendix: Test Scores

WISC-III: (IQ/Index & Scaled Scores)—1998 results:

| VIQ: 106 | Inf: 9 | PC: 9 |
| PIQ: 91 | Sim: 14 | CD: 5 |
| FSIQ: 99 | Ari: 10 | PA: 9 |
| VCI: 107 | Voc: 11 | BD: 12 |
| POI: 97 | Com: 11 | OA: 8 |
| FDI: 112 | DS: 14 | |

July, 2001 WISC-III, selected subtests (Index or Scaled Scores):

| CD: 3 | MZ: 5 |
| SS: 10 | PSI: 83 |

Trails A: 22"   Trails B: 40"

Grooved Pegboard: right: 62"; left: 71"

RCFT: (Raw Scores/Percentile Ranks/T-Scores, if available)
 Copy Accuracy: 30; 6-10%
 Copy Speed: 155"; >16%
 Immediate Recall: 23; T = 49; 46%
 Delayed Recall: 20; T = 43; 24%
 Recognition Total Correct: 20; T = 45; 31%

Hooper VOT: 26.5 correct

d2 Test of Attention (Standard Score):

| TN: 93 | TN-E: 92 |
| E1: 100-110 | CP: 90-100 |
| E2: 90 | FR: 94-100 |
| E%: 87-93 | |

Stroop Color and Word Test (T-Scores):

| W: 44 | CW: 44 |
| C: 42 | Interference: 51 |

BISHOP—p. 11

WCST:  (Raw Scores/Standard Scores/T-Scores/Percentile Scores)
 Total Number of Errors:  14; SS = 115; T = 60: 84%
 Perseverative Errors:  3; SS = >145; T = >90; >99%
 Nonperseverative Errors:  11; SS = 102; T = 51; 55%
 Percent Conceptual Level Responses:  76%; SS = 107; T = 55; 68%
 Failure to Maintain Set:  1; >16%


IVA Continuous Performance Test (Quotient scores):
 Response Control Quotients:
   Full Scale:  91
   Auditory:  91
   Visual:  93
 Attention Control Quotients:
   Full Scale:  77
   Auditory:  63
   Visual:  95
 Hyperactivity:  None


MACI:  (Personality Code):  -**2A*1//E**-*DG//-**-*CC//


Rorschach:

| R = 21 | L = 1.63 | | FC:CF+C = 2:0 | | COP = 0 | AG = 0 |
|---|---|---|---|---|---|---|
| | | | Pure C = 0 | | Food = 0 | |
| EB = 2:1.0 | EA = 3.0 | EBPer= N/A | SumC':WSumC | | Isolate/R = 0.14 | |
| eb = 2:2 | es = 4 | D = 0 | | = 1:1.0 | H : (H)+Hd+(Hd) = 1:1 | |
| | Adj es = 3 | Adj D = 0 | Afr = 0.40 | | (H+Hd) : (A+Ad) = 0:0 | |
| | | | S = 0 | | H+A : Hd+Ad = 4:2 | |
| FM = 0 | C' = 1 | T = 0 | Blends:R = 0:21 | | | |
| m = 2 | V = 1 | Y = 0 | CP = 0 | | | |
| | | | P = 1 | Zf = 14 | 3r+(2)/R = 0.00 | |
| a:p = 4:0 | | Sum 6 = 3 | X+% = 0.14 | Zd = -9.0 | Fr+rF = 0 | |
| Ma:Mp = 2:0 | | Lv2 = 0 | F+% = 0.23 | W:D:Dd = 12:4:5 | FD = 0 | |
| 2AB+Art+Ay = 0 | | WSum6 = 8 | X-% = 0.48 | W:M = 12:2 | An+Xy = 2 | |
| M- = 2 | | Mnone = 0 | S-% = 0.00 | DQ+ = 3 | MOR = 0 | |
| | | | Xu% = 0.38 | DQv = 0 | | |

| SCZI = 4 | DEPI = 4 | CDI = 4 | S-CON = 6 | HVI = No | OBS = No |
|---|---|---|---|---|---|



**DOUGLAS A. COL, Ph.D.**
*Clinical Psychologist*
Lic. # 1346

CONFIDENTIAL
Professional Use Only
Not Intended for Direct
Dissemination to Client

691 Murphy Road, Suite 218
Medford, OR 97504
Telephone: (541) 770-2491

## Psychodiagnostic Testing Evaluation

*The information contained in this report is of a very sensitive nature. The specific personality variables, scores, and ratios are intended for use by qualified professionals only. The only appropriate format for the release of this information to the individual being evaluated is as a very general description of the findings. Specific personality descriptions, testing scores, and ratios should not be released to the client under any circumstances without the prior approval of the clinical psychologist who prepared this report.*

**Name:**  Ernest Joseph Longini III

**Date:**  7/1/11

**Identifying Information:**  Mr. Longini is a 25-year-old, right-handed Caucasian man who had been seen by this author ten years ago, in the summer of 2001, under the name of Joe Bishop.

**Reason for Referral, and Source:**  Mr. Longini was referred to this author by the Oregon Department of Human Services' Presumptive Medicaid Disability Determination Team. The request was for a neuropsychological evaluation to determine if Mr. Longini might have any kind of neurocognitive problem that would qualify him for disability services. Unfortunately, the accompanying testing request form asked for tests that were outdated, and their use would have constituted a failure to use best practices in performing Mr. Longini's evaluation. Updated versions of the requested tests were used, supplemented by instruments that were better suited to discover Mr. Longini's reported problems.

**Assessment Instruments Used:**
Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV)
Wechsler Memory Scale, Fourth Edition (WMS-IV)
Rey Complex Figure Test (RCFT)
Continuous Visual Memory Test (CVMT)
California Verbal Learning Test—Second Edition (CVLT-II)
Bells Test
Mesulam Symbolic Cancellation Test
Mesulam Alphanumeric Cancellation Test
Line Bisection Test
Hooper Visual Organization Test (Hooper VOT)
Benton Facial Recognition Test
Benton Judgment of Line Orientation

LONGINI, Ernest Joseph—p. 2

Beery-Buktenica Developmental Tests of Visual-Motor Integration, Fifth Edition (Beery VMI):
   Visual Motor Integration (VMI)
   Visual Perception
   Motor Coordination
Raven's Standard Progressive Matrices
Boston Naming Test
SCAN-A Test for Auditory Processing Disorders in Adolescents and Adults
Spreen & Benton Abbreviated Token Test
IVA+Plus Continuous Performance Test
Wisconsin Card Sorting Test (WCST)
Delis-Kaplan Executive Function System:
   Trail Making Test
   Verbal Fluency Test
   Design Fluency Test
   Color-Word Interference Test
   Sorting Test
   Twenty Questions Test
   Word Context Test
   Tower Test
   Proverb Test
Quantitative Electroencephalogram (qEEG), with both NeuroGuide and LORETA analyses
Clinical Interview

**Psychosocial History:** Mr. Longini's history has been recounted numerous times in the past, and will not be repeated once again. Suffice it to note that he is reported to have had a stroke at birth, and as a result had a very low Apgar score and very poor muscle speed, strength and tone. He reportedly continued to have weakness and ataxia in the upper and lower extremities on his left side, with a significant tendency to fall to the left when walking as a young child. During his early years he was thought to be developmentally delayed/mentally retarded, and brain imaging studies reportedly found a cerebral lesion in the posterior region of his right hemisphere that might have been due to his perinatal stroke. At the age of six weeks Mr. Longini reportedly developed systemic viremia, which led to a high fever and possibly further brain damage.

Socially, Mr. Longini has had social problems since his preschool years, and received counseling for these problems between the ages of three and seven. He had a long history of social problems in school, and was frequently picked on by other students. Some years his mother felt that the situation was so bad that she had to pull him out and home school him, instead. In fact this author was involved in meetings with the Eagle Point School District in the late summer and fall of 2001, in an attempt to get the school to keep other students from victimizing Mr. Longini.

Because of his problems with social interactions in school Mr. Longini dropped out at the end of the 10th grade, and got his GED instead. He tried to go to college but apparently that that did not

work any better than high school for him, so he dropped out of that as well. He then joined the Marines, but by his account was discharged "for mental reasons" that he did not specify.

Mr. Longini said that his mother started giving him Vicodin (acetaminophen and hydrocodone) for migraine headaches as a child, and that later he started using OxyContin (time release oxycodone). After that he became involved in street drug use, including heroin, methamphetamines, lysergic acid diethylamide (LSD), psilocybin mushrooms, cocaine and crack. In February of 2011 he went through a rehabilitation program in Arizona, and was clean and sober at the time of his evaluation with this author—though his opioid habit was being treated with Suboxone, which is a combination of buprenorphine and naloxone. Medically, he complained of chronic back pain, though there was no independent confirmation of any back problems.

**Clinical Observations:** Mr. Longini was on time for all of his appointments. He was generally dressed in age-appropriate but casual clothing, and his hygiene usually appeared to be adequate. He was always well oriented to time, place and self, and his speech was always normal in rate, rhythm and tone, with no signs of any tangential or circumstantial thought. His sensorium appeared to be intact, and there were no signs of any bizarre perceptions, illusions, delusions, hallucinations or obsessions. He was able to pay attention and stay on task during his testing, and his general fund of knowledge appeared to be within gross normal limits. He seemed to have an adequate capacity for reasoning, and his insight and judgment both appeared to be intact. His mood was euthymic during his testing, with no signs of any significant alterations, fluctuations or dissonances in his affect. He appeared to give his best effort on all tasks, and the current measures of his abilities, strengths and weaknesses appear to be both valid and accurate.

**Test Results:** While one of the requested tests was the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III), this test has been supplanted by the Fourth Edition (WAIS-IV), so this was the version that was administered. Overall, Mr. Longini did quite well on this test, with a Full Scale IQ score that was at the bottom of the High Average range. His Verbal Concentration and Processing Speed Index scores were also good, in the upper half of the Average range, while his Perceptual Reasoning Index score was at the bottom of the High Average range and his Working Memory Index score was exceptionally good, near the top of the Superior range. Overall, Mr. Longini's WAIS-IV scores clearly indicated good levels of intelligence.

While his Full Scale IQ and Index scores were all quite good, there was much more variability in his individual subtest scores, which varied from Low Average to Very Superior. For example, relative to his Full Scale IQ his Coding and Vocabulary subtests scores were low, at the .05 level of statistical significance, and his Similarities score was also low, at the .15 level of significance. On the other hand his Information and Digit Span scores were both high, at the .05 level of statistical significance.

The very large, seven scaled score points difference between Mr. Longini's Vocabulary and Information subtest scores—and the fact that Vocabulary was the only WAIS-IV subtest on

SMART BUT CANNOT CONNECT All THE DOTS

LONGINI, Ernest Joseph—p. 4

which he produced a score that was below the Average range—was particularly interesting, since it seemed to suggest some kind of receptive language problem. His low Coding score—which was his lowest subtest score after Vocabulary—seemed to lend credence to this possibility, since anomalously low Coding scores are strong signs of non-specific neurocognitive problems. Mr. Longini's relatively low Similarities score further reinforced the impression of some sort of language-related problems. However, other than the indications of possible language problems, there were few signs of other neurocognitive deficits.

*incapable of Detail

Another request for testing was for the Wechsler Memory Scale, Third Edition (WMS-III); as with the WAIS the Fourth edition of this test (WMS-IV) is now current, and needed to be used instead. Mr. Longini's scores were somewhat lower—in the lower half of the Average range—on this test, but still within normal limits. Most of his subtest scores were also in the Average range, with the notable exception of both immediate and delayed Logical Memory, on which his scores were in the Low Average range. This was an interesting finding because his problems on the Logical Memory subtests seemed to correlate well with his low WAIS-IV Vocabulary score, in suggesting that he might be suffering from some sort of receptive language difficulties. Other than this, no problems were seen on his WMS-IV testing.

specific memories How Capable Exactly Plea?

That said, it is well known among experienced neuropsychologists that the WMS-III and/or WMS-IV are not the most sensitive tests for either visuospatial or auditory/verbal memory. In order to look more deeply into Mr. Longini's visuospatial memory, he was given the Rey Complex Figure Test (RCFT), which is a test of visuospatial memory and constructional skills. He did well on the Copy portion of this test, producing a nearly perfect drawing score in a very short period of time, indicating good drawing skills. However, his Immediate and Delayed Recall scores were both very poor, in the Extremely Low range, suggesting some significant memory problems. On the other hand his Delayed Recall score was quite good, in the upper half of the Average range.

The strong dissociation between very poor recall but intact recognition memory suggested that Mr. Longini might have some areas of brain dysfunction that are largely used in recall but not recognition. Likely candidates might include the anterior cingulate gyrus of his right hemisphere, the globus pallidus and/or putamen of his basal ganglia, and/or the dentate nucleus of his cerebellum.

In order to verify that his visuospatial recognition abilities are intact Mr. Longini was given the Continuous Visual Memory Test, which is a reasonably sensitive recognition-only test of visuospatial memory. He did exceptionally well on this test, with scores that were often in the Very Superior range. These findings supported the notion that he has some moderate problems with visuospatial recall, but not with recognition. Apparently his recall problems were severe enough to cause very significant deficits on the RCFT, but not significant enough to cause any notable deficits on the Visual Memory portion of the WMS-IV.

LONGINI, Ernest Joseph—p. 5

*THIS is ERRONEOUS process utiliz For Rule II purposes*

In order to investigate his auditory/verbal memory abilities more precisely Mr. Longini was given the California Verbal Learning Test, Second Edition (CVLT-II). He did very well on this test, with virtually no signs of any problems with auditory/verbal memory. That said, it should be noted that this test is for individual words only, and does not test a person's ability to derive the meaning from whole sentences or paragraphs, as do the Logical Memory portions of the WMS-IV. As a result the CVLT-II is not as sensitive to auditory processing difficulties as is the Logical Memory portions of the WMS-IV, which could explain his good scores on the CVLT-II but low scores on the Logical Memory subtests of the WMS-IV. In fact, the only anomaly that was seen on the CVLT-II was an elevated number of false positive responses on the Yes/No Delayed Recognition task—a finding that is more likely due to problems with impulse control than poor memory *per se*.

*IE. Manipula IE Alleged Crime Indirectn To Exend Plea*

In order to check for possible lateralized deficits a number of visual lateralization tests were performed. Mr. Longini did well on the Bells Test, with few missed targets and a very quick completion time. He did even better on the admittedly easier Mesulam Symbolic Cancellation Test, with no missed targets and an even shorter completion time. However he had a high number of missed targets that were fairly well dispersed across the stimulus sheet, despite a significantly longer completion time, on the Mesulam Alphanumeric Cancellation Test. The discrepancy between his scores on the two Mesulam tests strongly suggested some problems in the dorsolateral prefrontal cortex of his dominant/left hemisphere (Brodmann areas 9 & 46). No significant problems were seen on the Line Bisection test that would indicate any problems in the posterior regions of his brain.

In order to confirm that Mr. Longini's poor score on the Mesulam Alphanumeric Cancellation Test was due to left dorsolateral prefrontal cortex deficits, rather than posterior hemisphere vision problems, he was given several visual processing tests. He did exceptionally well on the Hooper Visual Organization Test (VOT), with a score that clearly indicated good functioning in the visual association cortices of his dominant/left hemisphere (Brodmann areas 18 & 19). Similarly, testing with the Benton Facial Recognition and Judgment of Line Orientation Tests indicated High Average and Superior functioning along the occipital/parietal and occipital/temporal axes of his non-dominant, left hemisphere, respectively—lending credence to the notion that he might have some left dorsolateral prefrontal problems, instead.

Because his performance was so poor on the Immediate and Delayed Recall portions of the RCFT, Mr. Longini was also given the Beery-Buktenica Developmental Test of Visual-Motor Integration (Beery VMI), to rule out any problems with visuospatial constructions. His scores were all within the Average range on this test, further supporting the notion of good parietal/ occipital functioning and suggesting that his problems on the RCFT were due to free-recall-specific memory problems.

Mr. Longini's scores on Raven's Standard Progressive Matrices further suggested the hypothesis of dorsolateral prefrontal rather than posterior cortex problems, since he had a perfect score on Set A but a poor score on Set E of that test. He was unable to get any of the more abstract or

difficult items on Set E correct, which strongly supported the idea that his problems are in the dorsolateral prefrontal region of his left hemisphere, rather than his right parietal lobe.

One of the testing requests was for the Reitan-Indiana Aphasia Screening Examination. This test was originally developed by Halstead and Wepman in 1959, making it over 50 years old. From time to time modifications have been made to the test, but critical studies of its accuracy and effectiveness have consistently shown it to be a poor neuropsychological instrument. Wepman himself rejected the test in 1975 and Lezak, in her book *Neuropsychological Assessment,* concluded: "Probably the best way of handling this test is Wepman's: simply junk it altogether." Because it is such a poor instrument, a number of other tests were used instead, including the Boston Naming Test, the SCAN-A Test for Auditory Processing Disorders in Adolescents and Adults, and the Spreen and Benton Abbreviated Token Test.

Mr. Longini's score on the Boston Naming Test was slightly low, falling on the dividing line between the Average and the Low Average ranges. This seemed to suggest grossly intact functioning in Wernicke's area of his left hemisphere, including the posterior-most portion of his superior temporal gyrus (Brodmann area 22) and adjacent portions of his angular gyrus (Brodmann area 39) and supramarginal gyrus (Brodmann area 40).

However, he did not do nearly as well on the SCAN-A Test for Auditory Processing Disorders in Adolescents and Adults, where he had Filtered Words, Auditory Figure-Ground and Competing Sentences subtest scores, that were all in the Extremely Low range, as was his Total Test Standard Score, clearly suggesting that he has an auditory processing disorder. This, in turn, suggested problems in his auditory association cortices, including Brodmann areas 41 & 42—the portions of his superior temporal gyrus that lie just in front of Wernicke's area in his left hemisphere.

Mr. Longini did well on the Spreen and Benton Abbreviated Token Test with only one missed item, and this was due to a lapse in auditory attention and not an auditory processing problem *per se*. This finding, along with his very good scores on the CVLT-II and an adequate score on the Boston Naming Test, seemed to suggest that he has a fairly well circumscribed deficit in the auditory association cortices of his left hemisphere that does not involve the surrounding cortical tissues.

Because lapses in attention during his testing, as well as false positive responses on the CVLT-II that suggested possible problems with impulsivity, Mr. Longini was given the computerized Integrated Visual and Auditory Continuous Performance Test (IVA+Plus) to look for possible problems with an Attention-Deficit/Hyperactivity Disorder (ADHD). While he was able to produce valid profiles, his scores on this test suggested that he has very serious problems with both attention and impulse control in response to both auditory and visual stimuli, clearly suggesting the likely presence of ADHD, Combined Type, Severe. On this test Mr. Longini had Severe problems with response control in reaction to both auditory and visual stimuli, which suggested significant problems in his bilateral orbitofrontal cortices (Brodmann areas 10, 11 &

47).  He also had Extreme levels of inattention in response to both auditory and visual stimuli.  However, he did not appear to have any problems with fine motor hyperactivity.  Overall, the IVA+Plus offered strong evidence of serious levels of ADHD.

Because the generally dysfunctional nature of Mr. Longini's life suggested the possibility of some executive function deficits, he was given the Wisconsin Card Sorting Test (WCST), and all of the tests from the Delis-Kaplan Executive Function System (D-KEFS) battery—including an updated and improved version of the Trail Making Test that was requested.  He did very well on the WCST, with scores that varied between the upper quartile of the Average and the middle of the Superior ranges, which suggested that he might not have any significant executive function deficits.

He also did well on many of the tests from the D-KEFS battery, including the Trail Making, Verbal Fluency, Sorting, Twenty Questions and Proverb Tests.  He had a slightly low Percent Design Accuracy score on the D-KEFS Design Fluency Test, a very low Move Accuracy score on the D-KEFS Tower Test, and a very poor Move Accuracy score on the D-KEFS Word Context Test, all of which seemed to reflect the problems with impulse control that were seen on the IVA+Plus, and his false positive responding on the CVLT-II—once again suggesting problems in his orbitofrontal cortices (Brodmann areas 10, 11 & 47).

The only tests in the D-KEFS battery on which he had significantly low primary performance scores were the Word Context and Color-Word Interference Tests.  On the Word Context Test he seemed to find it hard to come up with an appropriate word to fit the stimulus clues, suggesting possible word-finding problems and therefore problems in Wernicke's area of his dominant/left hemisphere.  Interestingly, his Low Average Consecutive Correct score on the Word Context Test was roughly equivalent to his rather low score on the Boston Naming Test, reinforcing the impression of some modest deficits in this cortical region.

He did well on the Color Naming subtest of the D-KEFS Color-Word Interference Test with a High Average score, and adequately on the Word Reading and Interference subtests with Average scores.  However, his Inhibition/Switching score was somewhat low, in the Low Average range, suggesting some problems with cognitive flexibility.  Since the items in Set E of Raven's Standard Progressive Matrices also require significant levels of cognitive flexibility, it is quite possible that the problems that were seen in the dorsolateral prefrontal cortices of his left hemisphere on Raven's Matrices also contributed to his low score on the Switching/Inhibition portion of the D-KEFS Color-Word Interference Test.

In an effort to see if any functional brain problems could be found that correlated with his neuropsychological testing deficits, a quantitative electroencephalogram (qEEG) was also conducted, using the 10/20 International electrode placement system and both NeuroGuide/ cortical surface and LORETA/depth analyses.  The only anomalies that showed up in the amplitude of his brain's activity in NeuroGuide were areas of increased cortical activity in his occipital lobes, particularly on the right side, in the Beta-3 (18-25 Hz) and High Beta (25-30 Hz)

frequency bands. There were also poor levels of synchrony between these cortical areas and other regions of his brain.

Using the same mathematical calculations that are used to produce MRI images, the LORETA software was able to determine that Mr. Longini has excessive levels of Theta (4-8 Hz) frequency activity in the dorsolateral prefrontal regions of his left hemisphere—Brodmann areas 9 & 46—that were implicated in his neuropsychological testing. As with his NeuroGuide analysis the LORETA software also found excessive levels of Beta-3 and High Beta—and also Beta-2 (15-18 Hz)—activity in the occipital region of his brain, particularly on the right side. Since there were no indications of visual processing difficulties in his neuropsychological testing, it was not clear if this excessive activity was a compensation for dysfunction in other areas of his brain, or reflected a primary problem itself.

More global—and more serious—than any of these deficits were phase reset problems that were seen throughout Mr. Longini's brain. In order to understand this statement one needs to know that, in addition to measuring the amplitude and coherence of neural activity in the brain the NeuroGuide software can also measure the instant-to-instant phase relationships in neural firing. When a person is evaluating a situation or deciding what to do about it, different areas of the brain have to communicate with each other, sharing and cross-correlating information.

When gathering information from disparate brain areas neurons tend to fire out of phase with each other, in a pattern that is called "phase shift," because of the variable patterns of phase relationship in the neurons' firing. Once enough information is gathered a kind of "closure" occurs, during which the neurons involved suddenly "lock into" phase synchrony with each other, correlating their gathered information and coming to whatever mental conclusions might be needed. The period of closure/synchrony is known as "phase lock," because the neurons are suddenly all "locked into" a certain phase relationship and firing in synchrony. Normal cognitive processes are marked by alternating periods of phase shift and phase lock, and the whole process is referred to as "phase reset."

In the average individual there are normal durations for these two processes, depending a person's level of intelligence. Persons of higher intelligence tend to have longer periods of phase shift—in essence gathering in greater amounts of disparate information—and shorter periods of phase lock, as their more efficient brains are able to integrate larger amounts of information more quickly. Overall, however, most individuals tend to have periods of phase shift and lock that fall within well-circumscribed limits. In Mr. Longini's case these limits were greatly exceeded.

The NeuroGuide analysis of his brain found that it is relatively normal in its rates of phase shift and lock over most cortical regions in most of the lower frequency ranges, from 1 to 18 Hz. However, in the higher Beta-3 (18-25 Hz) and High Beta (25-30 Hz) ranges the neurons across most of his cortex tend to fire in a highly aberrant fashion. In essence, is brain tends to "spin its wheels," shifting much more frequently and for much shorter periods of time than is adaptive. Such rapid shifting tends to bring in too little information for meaningful integration, leaving

him with inadequate levels of information upon which to base meaningful conclusions about what is going on around him, or how to react in response to situations.

This neurocognitive "cluelessness" is particularly problematic in the interpersonal realm, where it is crucial that a person be able to detect the subtle cues—i.e. large amounts of disparate information—that are involved in interpersonal interactions, including vocal rate and tone, facial expression, body language, etc. Unable to shift phase long enough to gather such disparate and subtle levels of information, Mr. Longini's brain is unable to provide him with the kinds of cues that he needs in order to be able to have productive interactions and relationships with others.

With regard to possible etiologies for this problem, the "pacemaker" for the phase reset process is the *nucleus reticularis* of the thalamus, which is a subcortical structure that lies immediately below the cerebral cortex. In Mr. Longini's case it appears that there is some sort of dysfunction in this part of his brain, possibly due to his perinatal stroke or, more likely, the high fever that he had at the age of six weeks when he suffered a serious case of viremia. The damage from that event appears to have left him unable to understand the world around him very well, or come to good decisions regarding what to do in that world, despite his good levels of native intelligence.

**Diagnostic Impression:**

| | | |
|---|---|---|
| Axis I: | 314.01 | Attention-Deficit/Hyperactivity Disorder, Combined Type, Severe |
| | 315.32 | Mixed Receptive-Expressive Language Disorder, Involving a Significant Auditory Processing Disorder |
| | 294.9 | Cognitive Disorder NOS, including basic cognitive processing deficits |
| Axis II: | V71.09 | No Diagnosis on Axis II |
| Axis III: | | Significant birth trauma, including a reported stroke, low Apgar scores, and lack of muscle tone; viremia and high fever when 6 weeks old |
| Axis IV: | | Estranged from mother; lifelong history of social dysfunction; no real friends; unable to maintain gainful employment; inadequate finances |
| Axis V: | GAF 43 | Present |

**Discussion:** Mr. Longini's neuropsychological testing suggested that he has focal problems in three areas of his brain: the auditory association cortex of his dominant/left hemisphere, the dorsolateral prefrontal cortex of that same hemisphere, and the orbitofrontal cortices of both hemispheres. The functional repercussion of the first of these deficits is a serious auditory processing disorder that makes it difficult for him to know, with any degree of accuracy, what is being said to him. This problem is not unlike that of a person having taken one term of a foreign language in school and then trying to go and live in a country where that is the only language

that is spoken. One will be able to understand some of what is being said, but not always enough to know what is really going on.

Mr. Longini's dorsolateral prefrontal cortical problems make it hard for him to engage in abstract conceptual thought, or to be fluid and nimble in his conceptual thinking, and his orbitofrontal deficits leave him with poor levels of impulse control. He also has severe problems with both auditory and visual attention and concentration, and the combination of these problems and his impulsivity leave him with a rather severe case of ADHD. Some significant problems with visual, but not auditory/verbal, recall were also noted.

However, more serious than any of these problems are the phase reset anomalies that were seen in Mr. Longini's quantitative EEG (qEEG). His brain appears to be unable to stay in the phase shift mode long enough to be able to gather enough relevant information to understand what is really going on around him, or to be able to decide what to do about it. Interestingly, when he was evaluated by this author ten years ago one of the findings suggested by his Exner scores on the Rorschach inkblot test was that he is quite compromised in his ability to perceive situations correctly, or consolidate disparate pieces of information into meaningful wholes. Apparently the Rorschach was able to detect the dysfunctional cognitive processes for which, ten years later, the NeuroGuide analysis of his qEEG was able to provide a neurological explanation.

**Recommendations:** Unfortunately, there are neither any medications nor any forms of psychotherapy that can meaningfully address Mr. Longini's phase reset problems. He could consider trying a stimulant medication for his severe levels of ADHD, but this is a dangerous proposition in an individual who has a very significant history of illegal stimulant abuse, including methamphetamines, cocaine and crack. The only other option would be EEG biofeedback, which has proven effective even in severe cases of ADHD, and in individuals with long histories of significant illegal stimulant abuse. The obvious problem with such a therapeutic approach is that it costs approximately $1,600 for a full course of treatment, and Mr. Longini is currently indigent, with no good prospects for being able to sustain gainful employment at any point in the foreseeable future.

EEG biofeedback therapy is even more interesting with regard to Mr. Longini's phase reset problems, because in the past year the Applied Neuroscience organization has produced a NeuroGuide EEG biofeedback program that can, in some cases, correct a person's phase rest problems. Unfortunately the technology for such biofeedback is quite expensive, costing roughly $20,000 for the basic hardware and software that is needed, not to mention the need for a technician to conduct such training. Again, this is clearly beyond the means of Mr. Longini.

The conclusion therefore seems to be that he has some very significant cognitive problems that have a very clear neurological/neuropsychological basis, and for which therapeutic approaches are available but lie out of the reach of his very limited financial resources. Given this regrettable state of affairs it is very difficult to see how Mr. Longini will ever be able to make his way in life without substantial, ongoing assistance from outside sources.

LONGINI, Ernest Joseph—p. 11

Thank you for referring this most interesting if unfortunate gentleman. If you should have any questions about this evaluation, please feel free to contact me.

Douglas Col, Ph.D.
Clinical Psychologist & Neuropsychologist

LONGINI, Ernest Joseph—p. 12

## Appendix: Test Scores

WAIS-IV: (IQ/Index/individual subtest scores)
FSIQ: 117

| VCI: 100 | PRI: 111 | WMI: 128 | PSI: 102 |
|----------|----------|----------|----------|
| SI: 9 | BD: 13 | DS: 17 | CD: 8 |
| VC: 9 | MR: 10 | AR: 13 | SS: 13 |
| IN: 14 | VP: 13 | | |

WMS-IV: (Index Scores)
Auditory Memory: 94
  Logical Memory I: 7
  Logical Memory II: 6
  Verbal Paired Associates I: 12
  Verbal Paired Associates I: 11
Visual Memory: 100
  Designs I: 8
  Designs II: 9
  Visual Reproduction I: 13
  Visual Reproduction II: 10
Visual Working Memory: 100
  Spatial Addition: 11
  Symbol Span: 9
Immediate Memory: 100
Delayed Memory: 93

RCFT: (Raw Scores, T-Scores if available, Percentile ranks)
Copy Accuracy: 35.0; >16%
Copy Speed: 139"; >16%
Immediate Recall: 15.5; T = 30; 2%
Delayed Recall: 10.5; T = <20; <1%
Recognition Total Correct: 22; T = 53; 62%
Recognition Errors: False Positive: 2; 6-10%    False Negative: 0; >16%

CVMT: (Raw Scores, Percentile Ranks)
Hits: 42; 100%
False Alarms: 7; 36.1%
d-Prime: 3.71; 100%
Total: 89; 98.8%
Delayed Recognition: 7; 100%
Visual Discrimination: 7

LONGINI, Ernest Joseph—p. 13

CVLT-II (Standard Scores/Semantic Clustering Standard Scores):

| Immediate: | Short-Delay: | Intrusions: Total: +1.0 |
|---|---|---|
| Trial 1: +1.5/0.0 | Free Recall: +1.0/0.0 | Free Recall: +1.0 |
| Trial 2: +0.5 | Cued Recall: +1.0 | Cued Recall: +1.0 |
| Trial 3: +0.5 | Long-Delay: | Total Repetitions: +1.0 |
| Trial 4: +0.5 | Free Recall: +1.0/+1.5 | Long-Delay Y/N Recog. Hits: +0.5 |
| Trial 5: +0.5/0.0 | Cued Recall: +0.5 | L-D Yes/No False Positives: +0.5 |
| List B: -1.0/-1.0 | Forced-C. Recog: 92.6% | Yes/No Total Response Bias: -2.0 |

Trials 1-5 Free Recall Total Correct (T-Score/Semantic Clustering Standard Score): 60/-0.5

Bells Test (number of errors): left: 2; center: 0; right: 1
completion time: 50"

Mesulam Symbolic Cancellation (number of errors): left: 0; center: 0; right: 0
completion time: 45"

Mesulam Alphanumeric Cancellation (number of errors): left: 5; center: 0; right: 2
completion time: 58"

Line Bisection Test:
left deviations (number: 5; average magnitude: 2.4 mm; percent deviation: -1.2%)
right deviations (number: 6; average magnitude: 1.5 mm; percent deviation: +0.24%)
center deviations: +0.24%

Hooper VOT: 28 correct; T = 45

Benton Facial Recognition Test (total number correct; Z-score): 48; High Average

Benton Judgment of Line Orientation (total number correct; Z-score): 30; Superior

Beery-Buktenica Developmental Tests of Visual-Motor Integration, Fifth Edition
(Standard Scores/T-Scores/Percentiles):
Visual Motor Integration: 103/52/58%
Visual Perception: 107/55/68%
Motor Coordination: 92/45/30%

Raven Standard Progressive Matrices: Total Score: 47    Percentile: 25%
Raw Scores: Set A: 12; Set E: 5

Boston Naming Test:
Total spontaneously correct: 54; Z = -0.68

LONGINI, Ernest Joseph—p. 14

SCAN-A: (Raw Scores/Standard Scores/Percentile Ranks)
 Filtered Words: 27; SS = 2; 1%
 Auditory Figure-Ground: 32; SS = 4; 2%
 Competing Words: 50; SS = 7; 16%
   Right Ear Advantage (raw score): 2
 Competing Sentences: 16; SS = 1; 1%
 Total Test: SS = 50; 1%

Spreen & Benton Abbreviated Token Test (total raw score; percentile score): 162; 70%

IVA+Plus Continuous Performance Test (Quotient scores):
 Response Control Quotients:
   Full Scale: 60
   Auditory: 62       Prudence: 66       Consistency: 72       Stamina: 82
   Visual: 66         Prudence: 61       Consistency: 106      Stamina: 67
 Attention Control Quotients:
   Full Scale: 40
   Auditory: 50       Vigilance: 30      Focus: 68             Speed: 107
   Visual: 50         Vigilance: 39      Focus: 60             Speed: 111
 Fine Motor Hyperactivity: 92
 Balance: 92
 Readiness: Auditory: 75    Visual: 102
 Sustained Attention Quotients: Auditory: 0        Visual: 6

WCST: (Raw Scores/Standard Scores/T-Scores/Percentile Scores)
 Total Number of Errors: 15; SS = 111; T = 57; 77%
 Perseverative Responses: 8; SS = 125; T = 67; 95%
 Perseverative Errors: 7; SS = 125; T = 67; 95%
 Nonperseverative Errors: 8; SS = 105; T = 53; 63%
 Percent Conceptual Level Responses: 76%; SS = 105; T = 53; 63%
 Failure to Maintain Set: 0; >16%
 Number of Categories Completed: 6; >16%

Delis-Kaplan Executive Function System
 Trail Making Test (scaled scores)
   Visual Scan: 12       Number Sequence: 9       Number-Letter Switch: 12
   Motor Speed: 12       Letter Sequence: 9       Number-Letter Sequence Comb.: 9
 Verbal Fluency Test (scaled scores)
   Letter Fluency: 16           Category Switching (Total): 14
   Category Fluency: 15         Category Switching (Accuracy): 16
     Letter Fluency vs. Category Fluency: 11
     Category Switching vs. Category Fluency: 9

Design Fluency Test (scaled scores)
  Filled Dots: 13          Switching: 9          Filled + Empty Correct: 11
  Empty Dots: 9            Total Correct: 11    Switching vs. Filled + Empty Correct: 8
      Total Designs:   Set Loss: 10   Repeated: 11   Attempted: 12
Color-Word Interference Test (scaled scores)
  Color Naming: 12        Inhibition: 9          Combined Naming + Reading: 11
  Word Reading: 10        Inhibition Switch: 7
      Inhibition vs. CN: 7    Switching vs. CN+R: 6    Switching vs. I: 8
Sorting Test (scaled scores)
  Free Sorting Confirmed Correct Sorts: 9
  Free Sorting Description Score: 8
  Sort Recognition Description Score: 12
  Combined Description Score: 10
  Sort Recognition vs. Free Sorting: 14
  Confirmed Correct Verbal Sorts: 12
  Confirmed Correct Perceptual Sorts: 8
  Combined Description Score, Verbal Rules: 9
  Combined Description Score, Perceptual Rules: 11
Twenty Questions Test (scaled scores)
  Initial Abstraction Score: 9
  Total Questions Asked: 12
  Total Weighted Achievement Score: 6
Word Context Test (scaled score)
  Total Consecutively Correct: 6
  Consistently Correct Ratio: 4
Tower Test (scaled score)
  Total Achievement Score: 9
  Mean First-Move Time: 7
  Time-per-Move Ratio: 10
  Move Accuracy Ratio: 4
  Total Rule Violations: 100%
Proverb Test (scaled scores)
  Free Inquiry Achievement Score: 10
  Multiple Choice Achievement Score (cumulative percentile rank): 100%
  Accuracy Score Only: 10
  Abstraction Score Only: 12

EXHIBIT FIVE (5)