# NEUROPSYCHOLOGY ASSOCIATES, P.C.

**1515 EAST MISSOURI AVENUE, #110**
**PHOENIX, ARIZONA 85014**

H. Daniel Blackwood, Ph.D., ABPP
Board Certified in Clinical Neuropsychology

Appointments available in Prescott

PHONE: (602) 230-8324
FAX: (602) 274-7402

## INDEPENDENT NEUROPSYCHOLOGICAL EVALUATION

**Name:**     Ernest Joseph Longhini III
CR2016-000667-001

**Age:** 32
**Date of Birth:** January 31, 1986
**Education:** GED
**Tests Administered:** Performance/Symptom Validity Tests, Aphasia Screening Tests, Clock Drawing Test, Wechsler Memory Scale-Fourth Edition (WMS-IV) (Stories), Hopkins Verbal Learning Test-R, Similarities subtest of the Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV), Rey Complex Figure (immediate production and memory), Stroop Color-Word Test, Affect Naming subtest of the Advanced Clinical Solutions, Problems in Everyday Living Test (PEDL), Social Responsiveness Scale (SRS-2), Autism Questionnaire (AQ), MCMI-III
**Referred by:** Brian Di Pietro, Esq.
**Places of Evaluation:**  Phoenix Office and Maricopa County Courthouse
**Dates of Evaluation:** January 15, 2018, January 23, 2018, January 24, 2018,

**History from Records**

Information from records provided by Mr. Longhini's mother, Ms. Erin Bishop, includes the following.

On September 12, 2001, Mr. Longhini, at the age of 15, was seen in psychological examination by Douglas Col, Ph.D.

> Dr. Col noted that Mr. Longhini was reported to have suffered a stroke at birth, to have had a very low Apgar score, poor postpartum muscle tone, speed, and strength. He exhibited weakness and ataxia in the left extremities. He suffered a sustained high fever at the age of six weeks. He was labeled developmentally disabled in his early years. He had exhibited social difficulties since his preschool years and had received counseling between the ages of three and seven. He had been unable to attend schooling on campus at times, receiving homeschooling. He was facing possible expulsion from school at the time of the examination.

> On a continuous performance test, Mr. Longhini's results were consistent with ADHD, primarily inattentive type. He showed improvement in dexterity compared to a previous examination in 1998. Intellectual abilities were generally within normal limits.

> Mr. Longhini's responses to a structured behavioral questionnaire indicated serious problems with social functioning. He was described as feeling threatened and potentially overwhelmed by social interactions. He was described as being inhibited,

Independent Neuropsychological Examination
Ernest Joseph Longhini III
CR2016-000667-001 DT

introverted, having problems with family conflict, issues of sexual insecurity and/or discomfort, and poorly controlled acting-out tendencies.

Projective testing also showed numerous signs of insecurity, inadequacy, and dependency, along with depression. Projective testing indicated that Mr. Longhini had "a very strong tendency to misperceive events and form mistaken impressions of people and what their actions mean. As a result he tends to be quite impaired in his social perceptions, quite vulnerable to misperceiving what other people are thinking or feeling, and to have little idea why they act in the ways they do." It was noted that he was "quite vulnerable to engaging in inappropriate social behaviors, and/or maladaptive social interactions."

Dr. Col noted that the combination of social/perceptual difficulties and impulsivity resulted in a lack of social skills and very significant problems in interpersonal relations. Mr. Longhini was described as "unable to understand the intentions, motivations, or actions of others."

Dr. Col rendered diagnoses of cognitive disorder NOS, with a prominent disturbance of social relations; attention deficit/hyperactivity disorder, predominantly inattentive type; dysthymic disorder, and relational problems secondary to organic brain dysfunction. He recommended consideration of antidepressant medication, stimulant medication, weekly counseling and social skills training outside of the school setting, classroom accommodations for auditory attention deficit, and closer interaction with school counselor/advocate.

On July 1, 2011, Dr. Col saw Mr. Longhini, then 25 years old, for re-examination. Only about every other page of the report is available. Mr. Longhini was noted to exhibit severe problems with attention and impulse control on a continuous performance test. Other executive functions were variable. He did well on conceptual tasks for the most part and was able to maintain multiple lines of thought reasonably well. Dr. Col described Mr. Longhini as essentially "clueless" in the interpersonal realm, with difficulties in the perception of vocal rate and tone, facial expression, body language, etc. Dr. Col attributed this to brain damage suffered at the time of the perinatal stroke and/or high fever at the age of six weeks. He rendered diagnoses of ADHD, combined type, severe, mixed receptive-expressive language disorder, and cognitive disorder NOS. He noted that Mr. Longhini also exhibited abnormalities on a quantitative EEG. He recommended neurofeedback as a treatment option. He indicated that it would be very difficult for Mr. Longhini to "ever be able to make his way in life without substantial ongoing assistance from outside resources."

On November 2, 2012, Dr. Col stated that previous quantitative EEG's in 2011 had indicated that Mr. Longhini was "exceptionally poor at gathering and consolidating relevant pieces of information. As a result he often seems to misperceive situations and misconstrue what might be appropriate actions to take in any given situation." Dr. Col conducted another quantitative EEG in August 2012, following a reported attack in which Mr. Longhini had been seriously beaten in the face and head. His functionality was reported to have deteriorated significantly after the attack. The updated quantitative EEG was more abnormal than the study in 2011.

Independent Neuropsychological Examination
Ernest Joseph Longhini III
CR2016-000667-001 DT

On July 12, 2013, Mr. Keith Breswick, Civil Commitment Coordinator in the Addictions and Mental Health Division of the Oregon Health Authority, noted that Jackson County Mental Health had recommended civil commitment for Mr. Longhini based on a finding of probable cause that Mr. Longhini was a mentally ill person.

## Test Results

Mr. Longhini's performance on various tasks of performance validity and validity of symptom-reporting indicate that he was putting forth good effort on cognitive tasks and that he most probably was not exaggerating the extent of any psychiatric disturbance.

Mr. Longhini was able to provide pertinent personal information and to name the current president. He was completely oriented to time and place.

Basic language functions appear adequate for normal daily conversation. Gestural communication appears reasonably intact, as do repetition and auditory comprehension.

Handwriting is legible. Graphic constructional skills are adequate for simple geometric figures. In drawing the face of a clock he was able to place the numbers in the proper sequence and able to place the hands in the proper positions to indicate a designated time.

Immediate recall of paragraph-length narrative material is in the average range, as he produced 23 elements of the stories from the WMS-IV, producing an age-corrected scaled score of 9. His subsequent retention is in the average range, at an age-corrected contrast scaled score of 9, as he performed as well in the delay condition as one would expect based upon his immediate recall.

Further investigation of verbal learning with the HVLT elicits borderline performance in terms of total number of words produced over the three acquisition trials (22), at a T-score of 35. His delayed recall is also in the borderline range, as he retained 75% of the originally registered material following a 20-minute interval, at a T-score of 35. Recognition recall is in the average range, as he correctly identified all 12 target words, with two false positive responses, at a T-score of 44.

Delayed recall of visual-spatial material is in the high average range, as he produced 68% of the originally registered material of the Rey Complex Figure.

Independent Neuropsychological Examination
Ernest Joseph Longhini III
CR2016-000667-001 DT

Verbal abstraction is in the average range, as he produced an age corrected scale score of 11 on the Similarities subtest of the WAIS-IV.

The ability to inhibit reflexive responding in an emotionally neutral context is within normal limits, as he performed about as well in the Interference condition of the Stroop Color-Word Test as he did in either of the individual conditions.

He produced 28.5 of 36 elements of the Rey Complex Figure, producing a T-score of 40, reflecting low average planning and organization when dealing with more complex visual-spatial material.

On the Affect Naming subtest of the Advanced Clinical Solutions Mr. Longhini performed in the average range in terms of matching pictures of facial expressions to verbal labels of the emotion being expressed.

On the PEDL, Mr. Longhini's responses reflect a level of verbal expression of judgment which is in the deficient range compared to healthy elderly subjects and in the average range compared to individuals with a diagnosis of Alzheimer's disease.

On the SRS-2 Mr. Longhini's responses reflect severe deficiencies in reciprocal social behavior which would lead to severe and enduring interference with everyday social interactions. His results are similar to individuals with a diagnosis of autism. His responses reflect difficulty in perceiving social cues and severe difficulty in interpreting such cues, along with difficulties in social communication, social motivation, and in exhibiting restricted interests and repetitive behaviors.

Mr. Longhini's responses to the AQ reflect a high probability of a diagnosis on the autistic spectrum.

General behavioral and personality factors were sampled with the MCMI-III. The validity scales indicate that Mr. Longhini is experiencing acute turmoil. He approached the task in a problem-oriented fashion, with adjustments accordingly being made to the clinical scales. Actuarial interpretive statements include the following. "This man's foundation for effective intrapsychic regulation and socially acceptable interpersonal conduct appears deficient or incompetent. He is subjected to the flux of his own enigmatic attitudes and contradictory behavior, and presence of psychic coherence is often precarious." His personality may "lead to his anxious seeking of reassurance from others and to an intense fear of separation from those who provide support." He "may have permitted others to be exploitive and abusive." He struggles to be "obliging and submissive." At the same time, "he has begun to anticipate that his relationships will be troublesome, an attitude that often creates the expected disappointment." He may experience psychotic symptomatology at times with delusional and paranoid thinking. "He believes that he has been betrayed or forsaken by persons whose support he had hoped to gain." Major depressive disorder and generalized anxiety disorder are likely. He views recent events in a manner similar to one experiencing posttraumatic stress symptomatology. His responses reflect a history of drug abuse. His responses clearly indicate the need for aggressive psychiatric/psychological intervention.

Independent Neuropsychological Examination
Ernest Joseph Longhini III
CR2016-000667-001 DT

## Summary

Mr. Longhini is a 32-year-old man who suffered significant perinatal trauma and a high fever at the age of six weeks. He experienced numerous developmental physical and mental problems and had difficulty dealing with school from a social standpoint, being bullied. Extensive psychological evaluations from many years prior to the current legal situation documented significant functional impairment for Mr. Longhini.

When Mr. Longhini was 15 years old, the examining psychologist wrote that he had "a very strong tendency to misperceive events and form mistaken impressions of people and what their actions mean. As a result, he tends to be quite impaired in his social perceptions, quite vulnerable to misperceiving what other people are thinking or feeling, and to have little idea why they act in the ways they do." It was noted that he was "quite vulnerable to engaging in inappropriate social behaviors, and/or maladaptive social interactions." At that time the examining psychologist, Dr. Col, rendered diagnoses of cognitive disorder NOS, with a prominent disturbance of social relations; attention deficit/hyperactivity disorder, predominantly inattentive type; dysthymic disorder, and relational problems secondary to organic brain dysfunction.

When Mr. Longhini was examined again at the age of 25, Dr. Col described Mr. Longhini as essentially "clueless" in the interpersonal realm, with difficulties in the perception of vocal rate and tone, facial expression, body language, etc. Dr. Col again attributed this to brain damage suffered at the time of the perinatal stroke and/or high fever at the age of six weeks. He rendered diagnoses of ADHD, combined type, severe; mixed receptive-expressive language disorder, and cognitive disorder NOS. He noted that Mr. Longhini also exhibited abnormalities on a quantitative EEG. He indicated that it would be very difficult for Mr. Longhini to "ever be able to make his way in life without substantial ongoing assistance from outside resources."

The results of the current examination confirm previously identified problems and document their ongoing, chronic nature. While Mr. Longhini performs within normal limits on tasks of non-social cognition such as registration of verbal material and verbal abstraction, his verbal expression of judgment is in the deficient range compared to healthy elderly subjects and in the average range compared to individuals with a diagnosis of Alzheimer's disease.

Mr. Longhini's responses to structured behavioral questionnaires indicate difficulties in social interactions similar to those of individuals on the autistic spectrum. His social cognition and his ability to maintain socially acceptable interpersonal conduct are deficient or incompetent. He is extremely insecure in interpersonal interactions and interpersonal relationships, and he tends to interact with those whose approval he seeks in an obliging and submissive manner. He repeatedly seeks reassurance from others and has an intense fear of separation from those whom he sees as providing support. He is vulnerable to exploitation and abuse. He may experience delusional and paranoid thinking at times, and he believes that he has been betrayed or forsaken by persons whose support he had hoped to gain.

Mr. Longhini's behavior in interview with investigating officers reflects obvious confusion. He admits to inappropriate interactions with one of the alleged victims that the victim herself denies.

Independent Neuropsychological Examination
Ernest Joseph Longhini III
CR2016-000667-001 DT

His statements reflect emotional immaturity and emotional confusion. In his interactions with the described victims, from a social and emotional standpoint, he was, in effect, dealing, at best, with peers.

One certainly cannot rule out the possibility that Mr. Longhini is magnifying problems or responding in a self-serving manner, but, once again, documentation of Mr. Longhini's emotional and social deficiencies was initially accomplished many years before the events in question.

Mr. Longhini's mother, while also possibly presenting information in a manner intended to be circumstantially helpful to Mr. Longhini, describes his behavior in a manner consistent with clinical information.

H. Daniel Blackwood, Ph.D.

Neuropsychology Associates, P.C.          1515 East Missouri Avenue, #110          Phoenix AZ 85014

EXHIBIT SIX (6)

Clerk of the Superior Court
*** Electronically Filed ***
M. Yelverton, Deputy
7/31/2019 3:34:54 PM
Filing ID 10719571

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,                )
                                 )
        Plaintiff,               ) SUPERIOR COURT
                                 )
     vs.                         ) CR2016-000667-001
                                 )
ERNEST JOSEPH LONGHINI, III      )
                                 )
        Defendant.               )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SENTENCING

BEFORE:    The Honorable John Rea
           Judge of the Superior Court

Phoenix, Arizona
April 23, 2019

Gail E. Ferguson
Certified Court Reporter
(AZ 50797) PRT

2

APPEARANCES:

On behalf of the State:
Lacey Fisher
Deputy County Attorney

On behalf of the Defendant:
Brian di Pietro
Attorney at Law

3

P R O C E E D I N G

THE COURT:   Let's go on the record in State of Arizona vs. Earnest Joseph Longhini, III, the case is CR2016-000667.

Appearances, today.

MS. FISHER:   Your Honor, good morning.  Lacey Fisher appearing on behalf of the State.

MR. DI PIETRO:   Good morning, Judge. Brian Di Pietro for Mr. Longhini, who is present, in custody.

THE COURT:   This is the time set for sentencing. Is the defendant ready to proceed today?

MR. DI PIETRO:   Yes, Judge.

THE COURT:   Mr. Longhini, would you state your full name and your date of birth, please.

THE DEFENDANT:   Earnest Joseph Longhini, III, January 31, 1986.

THE COURT:   In an earlier hearing in this case there were pleas -- there were determinations of guilt by pleas of guilty to Count 5, Count 7, Count 16, Count 28, Count 30 and Count 35 that were accepted by the Court.

It is the judgment of the Court today, then, that the defendant is guilty of amended Count 5, child prostitution, a Class 2 felony, committed on

May 18, 2015 through and including July 7, 2016, in violation of Arizona statutes.

It is the judgment of the Court that the defendant is guilty of amended Count 7, attempted sexual assault, a Class 3 felony, committed on May 18, 2015 through and including July 7, 2016, in violation of Arizona statutes.

It is the judgment of the Court that the defendant is guilty of amended Count 16, attempted sexual assault, a Class 3 felony, committed on May 18, 2015 through and including July 7, 2016, in violation of Arizona statutes.

It is the judgment of the Court that the defendant is guilty of amended Count 28, attempted sexual assault, a Class 3 felony, committed on May 18, 2015 through and including July 7, 2016, in violation of Arizona statutes.

It is the judgment of the Court that the defendant is guilty of amended Count 30, involving or using minors in a drug offense, a Class 2 felony, committed on January 1, 2016 through and including July 7, 2016, in violation of Arizona statutes.

It is the judgment of the Court that the defendant is guilty of amended Count 35, attempted involving or using minors in a drug offense, a Class 2

felony, committed on January 1, 2016 through and including July 7, 2016, in violation of Arizona statutes.

All counts are non-dangerous, non-repetitive under the criminal code.

At this time, pursuant to the stipulations in the plea agreement, Counts 1 through 4, Count 6, Counts 8 through 15, Counts 17 through 27, Count 29, and 31 through 34, and 36 through 39 are dismissed.

The plea agreement contains stipulations for prison terms on Count 5 and Count 30, as well as probation tails in the other counts.

The pre-sentence report writer has recommended a sentence greater than the presumptive for Count 30 and Count 5.

What's the State's recommendation?

MS. FISHER:  Thank you, Your Honor.  And I have a written sentencing recommendation but it didn't find its way into the pre-sentence report, but I can certainly encapsulate the sentencing recommendation.  I know you're familiar with this case, you handled the settlement conference, so I won't belabor the facts.

But there are many, many aggravating factors in this case.  The number of victims, as well as the age of the victims, are aggravating factors.  The fact that the defendant was essentially providing these minors

6

with very addictive dangerous drugs and, in fact, injecting them with these drugs in exchange for sex is incredibly concerning.  The one victim, obviously, described that on multiple occasions the sexual contact was forced or not consensual.  And, obviously, all of these kids were put in a weakened state when they were under the influence of drugs or injected by drugs by Mr. Longhini.

Mr. Longhini himself admitted to sex acts with the listed victim A.  He also admitted to injecting her countless times, I think were his words, with different types of drugs, as well as other minors.  I really can't imagine or express to the Court the long reaching impact that this will have on these kids.

In addition to the just extreme emotional effect the sex crimes have on these children, they are continuing to struggle with addiction since they were injected by Mr. Longhini with these drugs for so many, for such a period of time.

It's my understanding from victim MS's, the initials MS, her guardian, that at our last check with her she was actually in a comatose state due to overdosing on drugs.

So I think the Court is well aware of the dangers of this and the long term impact that this is

going to have on these victims.

Given all of that, I am asking that the Court follow the terms of the plea and in Count 5 impose the stipulated term to run consecutively to the term in Count 30. I'm recommending an aggravated term of 10 years for Count 30, I think it's appropriate.

I'm not denying that the defendant does have mitigation, I reviewed the information that Mr. Di Pietro provided. But on balance I think, given the extreme amount of aggravation in this case, an aggravated term is appropriate.

I would then ask that the Court retain jurisdiction over restitution and follow the stipulations related to the other counts, including registration, sex offender terms, and life time probation.

THE COURT: And all victim's rights have been complied with for sentencing?

MS. FISHER: Yes, Your Honor.

THE COURT: Thank you.

Are there any people here today that would like to speak?

MR. DI PIETRO: Yes, Judge. Mr. Longhini's mother, Ms. Bishop, wishes to address the Court.

THE COURT: Ask her to come forward, please.

MR. DI PIETRO: Yes, Judge.

THE COURT:  Thank you for coming, ma'am.  If you would state your name, please, for the record.

THE WITNESS:  My name is Carol Erin Bishop.

THE COURT:  Thank you.  Go ahead.

THE WITNESS:  I'm Joe's mother and I was there when he became brain damaged.  At birth, just before our C section, a man bounced in and said, I do these shots quite well, and he gave me a shot in the spine and I went into convulsions.  And I screamed.  And he said, I have to give you another one.  And I said why.  And he said, you will be numb on both sides.  And they gave me another one.

This constituted a double dose at Joe's -- for Joe's birth and it caused the anesthetics to go up on me.  Both of us nearly died because it went to my brain stem.

I'm a teacher of 30 years.  I've studied a great deal of this stuff.  I have a Bachelor's, a Master's, I've done several fellowships.  And so I knew what to watch for.  If you've been through teacher's college or know about it, I knew what to watch for.

And at 18 months he was pronounced hyperactive and mentally retarded.  I don't believe he's mentally retarded quite.  But I wanted you to know about this.

The other thing I'll say is I saw the sign

here, victims on that side and defendants on that side. And I wasn't sure which side to sit on.

Because I started calling MCSO, and I had -- well, I had so much trouble with these girls that they now owe me over $30,000, including credit card theft. We took our dog doors out and they crawled in through windows, or where I would find that they had slept on the curb in my car. I called their mother, I called their father. I have talked to everybody. And I feel like the only person who is being victimized here are these poor girls. And as to whether they're still using drugs, they were when they walked in my house, and I bet you they are still using now.

At any rate, I brought with me, because I suspect you haven't seen them, two of the psychological reports. One is from Dr. Blackwood, Arizona's first board certified neuropsychologist. He says at the end of it, Joe is incapable of living alone. He wasn't living alone and they crawled in and got him, more or less. What they did find out was that Joe had a driver's license.

He also wrote in his report, as he deals with people, he sees everybody the same age. In his mind you're the same age as he is. Ms. Gray is the same age he is. And it's something I noticed when he was little, but he does do that.

`10

He has other types of brain damage.  And one of them -- can I read the ending paragraphs of these reports?

THE COURT:  Yes.

THE WITNESS:  On the SRS2, Mr. Longhini's responses reflect severe deficiencies in reciprocal social behavior and severe and enduring interference with every day social interactions.  His results are similar to individuals with diagnosis of autism.  His responses reflect difficulty in perceiving social cues and severe difficulty in interpreting such cues, along with difficulties in social communications, social motivation, and exhibiting restricted interest in repetitive behaviors.  His response to the AQ reflect a high probability of diagnosis on the autistic spectrum.

I would like to say that his father and I have gotten him clean in Oregon in about 2016.  I bring him up here.  And the reason he's gone astray is that the girls -- we have a bedroom window that's quite low to the floor.  The girls are coming over, Joe, take me here; Joe, take me there.

And I'm sure no one told you that at one point all three sisters had agreed to marry him.  What's wrong with that picture?  Normal men don't do that and normal girls shouldn't be doing that.  But it was

manipulate, manipulate, manipulate.

And I did try to stop it. Did I tell you when I went to court to get restraining orders against these girls? I told them sort of what I just told you, and more. And the judge said, why didn't you call the police. And I said, I have with me a sheet of call outs. At that time there were 56 call outs to my residence made by me. Your run away is back, come and pick her up, do this, do that.

And I really do feel that if the police, or if the MCSO had stood behind me and run them off and run their dealers off. I know the dealers in Anthem by name. I know the local pimp by name who admits he slept with the twins when they were 12. I mean, there's a collection -- I see you're smiling, I don't find it very funny at all.

Mr. Longhini's interview with investigating officers reflects obvious confusion. It has been an issue since birth.

And I have over 200 pages written, this is single space, which I intend to publish on the internet and it will be called, Except in Arizona. Because mitigating circumstances aren't accepted in Arizona.

Dr. Call's report from Oregon says that he shouldn't live alone. Well, he has severe phase reset anomaly. That means when the synapses in the brain are

`12

supposed to connect, his miss repeatedly.  One of the drawbacks of phase reset anomaly caused by the brain damage to his amygdala pre-frontal cortex and madulla regulara.  Those are things that operate critically in the brain.  He just doesn't get it.

Now his father was an engineer, I'm a teacher.  We worked hard on having him learn the basic things so he doesn't look quote, unquote, "retarded."  But -- anyway.

However, more serious than any of these problems of the phase reset anomalies that are seen in Mr. Longhini's quantitative EGG, his brain appears to be unable to stay in the phase shift mode long enough to be able to gather enough relevant information to understand what is really going on around him, or to be able to decide what to do about it.

Interestingly, when he was evaluated by this author 10 years ago, one of the findings suggested by his scores was that he is quite compromised in his ability to perceive situations correctly or consolidate disparate pieces of information into meaningful wholes.

I'm sure if you went to college you studied Thatcher psychology and his biological report.  And that explains phase reset..  as it continues to create black holes in the brain.  These are people much more educated

than I am, and much greater specialists than I am.

This is why it's so frustrating.  I have known this all along and I have worked to keep him in an environment where we can keep him clean, we can keep him away from users.  And we got the girls.  And he could --

EEG biofeedback therapy is even more interesting with regard to his reset problems because in the past years the applied Neuro Science Organization, with its EEG biofeedback, that can, in some cases, correct a person's phase reset problems.  Unfortunately, the technology for this is quite expensive, costing roughly $20,000.

Another reason I wanted him here is that with the passing of time, or because we've got the Mayo Clinic and some other significant hospitals here, it's not that expensive anymore and I thought we're going to get him through that.

A conclusion, therefore, seems that he has significant cognitive problems that have a very clear neurological, neuropsychological basis and for which therapeutic approaches are available but lie out of the reach of his very limited finances.

Given this regrettable State of affairs, and this is when he was 21, it is very difficult to see how Mr. Longhini will ever be able to make his way in life

'14

without some substantial ongoing assistance from outside sources. And he didn't mean jail.

I am appalled at the way my son has been treated. And I have tried to talk to deputies, and the girl don't get cited. When my credit cards are stolen and their signatures are on my credit card receipts, nothing happens to the girls. They took a gun out of my house, they took all kinds of valuable things, my mother's jewelry, my grandmother's jewelry, it's all gone. Any tiny little stash I had that I could sell in an emergency, everything has been picked clean.

And they honestly thought that if they were marrying Joe they could move me out of my own house. Those girls couldn't have paid the rent at that house, couldn't have paid the water bill at that house.

I would also like to make a comment of what else I've been through. He is definitely a vulnerable adult. And as I worked this, I have invited seven lieutenants into my house knowing that what I could say could be used against me. None of it comes back in the reports, she maintains that she read us these reports. I brought them into my home to show them how easy access was.

They could come up to that window, we had locks, we had cameras. They could -- the windows on the

side of the walkway, they can just step into the house through that window.  They walk around -- and you can come in the front door.  Okay?  So the front door, I can see everything that's going on.  Further more, they open any of the sliders they can get open and slide in, or they use the puppy door.  The more we tried to keep them out, the more determined they were to come in.

And always, always, they had an emergency.  Oh, Joe, you've got to take me here, you've got to take me there.  I need this, I need that.  I'm so sick.

And even though I taught for 30 years, this was the first time I learned what sick means.  It means needing drugs.  I didn't know that.  One girl came over, I'm so sick, my lungs are congested.  And blah, blah, blah blah.

So I went to Wal-Mart and bought her a vaporizer because she's got the flu, she's got asthma, something, with the receipt on the top.  Gave her the box and the receipt.  And learned she took it back and had drug money.  I walked right into that.  I have never seen a neighborhood like I live in.  And I want you to -- they knocked out six of his top teeth, some deputy did.

We have had so much circuitous charging that on an FTA that had been thrown out, they came to arrest him when he was standing with his bicycle outside

Domino's in Anthem. And two officers were holding him with his hands just crossed behind his back. And suddenly six henchmen sent by Deputy Graham come charging, they knock him down, they knocked out six of his upper teeth, three of his upper teeth. That cost a lot. To get them in now I have to pay for it again with the prison entanglement.

And one of them gets in his face and says, get up and run so I can tackle you. What kind of sadistic jerks does MCSO employ? I have never seen, and I've moved all around from Florida to here, I have never seen a place that has a cadre of petty, mean, vindictive bullies as the Sheriff's Office has.

THE COURT: Ma'am, what are you asking for sentencing?

THE WITNESS: I am asking that you consider that he has not stepped out and planned any of this. These girls took a very active part, and they wouldn't stay out of my home. I would beg you, at the very least, if you have to sentence him, please send him to the south yard. As his guardian, there is a thing in the guardianship papers that says I am mandated to do the best I can to see that he gets the most education he can possibly get. And I would like him sent to the south yard where he can get more education, anything that might help him.

understanding.

THE COURT:  I appreciate the information.

Go ahead.

MR. DI PIETRO:  Yes, Judge.  We'd ask the Court to make the defense recommendation that we submitted to it be part of the pre-sentence report.

THE COURT:  All right.

MR. DI PIETRO:  I would like to point out just a few things, Judge.  Mr. Longhini currently has a petition in the probate court to be determined an incapacitated person, as was recommended by the two neuropsychologists who had examined him.  I was speaking with the attorney who has experience in these particular matters and he said that it's highly likely that that's going to be the outcome of the hearing, that he will be so designated.

Because the fact is that he's incapable of looking out for himself, as the doctor said.  He's going to need third party intervention, can't live alone by himself.

Knowing those circumstances, which got him in trouble in this particular case were these girls who came to his house after they had learned that he knew how to inject them so that they could get their drugs injected.  They already were addicts before they met Mr. Longhini.  Mr. Longhini did not go out and meet these

THE COURT:  I can recommend that but ultimately that's up to the Department of Corrections.

THE WITNESS:  Who do I speak to there?

THE COURT:  I don't know.

THE WITNESS:  Did you say you can recommend it?

THE COURT:  I can recommend it.  For whatever it's worth, I will.

THE WITNESS:  Thank you.  That would be much appreciated.

And I would like Ms. Gray to know that not all of this is as bad as Deputy Graham said.

THE COURT:  I can't hear you if you're not facing me.

THE WITNESS:  I would like her to know that not all of this is as bad as Deputy Graham made it sound. You can't believe all that stuff.  That's why I had deputies come to my house, I read them these documents.  It's like they honestly don't care.  If they did, they would have -- I told you about showing 56 call outs to the judge in the north valley.  Surely they could have done something.  I mean, I feel like I've spent every dime to keep him safe. And that's how I look at it, to keep him safe.

My brain damaged child wasn't up to coping with this.  And I don't feel that the police did what they should.  I really don't feel that.  Thank you for your

people, he did not invite them come to his house.  All these girls chose to voluntarily come to his house.

Mr. Longhini was not the source of the drugs, he wasn't providing drugs to these girls.  He might have on one occasion shared the drugs with them that he had.  On their cell phones that were seized by the Sheriff's Department the text messages between the sisters and their friends talked about three other sources of, or three source of obtaining their drugs.  They were getting their drugs from other places, they listed three sources on the phone conversations.

They talked about how they could manipulate Mr. Longhini to get him to do anything they want.  They bragged about the fact that when he would suggest sex that they could avoid it because they knew how to get him to do whatever they want.

So if they engaged in any type of sexual activity with Mr. Longhini, it wasn't against their will, they chose to do that, because they understood that Mr. Longhini had an issue with not being able to do what they would not necessarily want him to do.

They were masters at manipulation for Mr. Longhini.  They referred to him as crazy, I think is the phrase that they used, that he was crazy.  So they knew that there was something wrong, they didn't care what

it was or not just as long as they could satisfy their selfish desires and their selfish need to get drugs.

When they got caught, then they blamed everything on Mr. Longhini and made him out to be the bad guy. The fact that they were 15 and 16 years old doesn't mean that they couldn't manipulate and that they couldn't participate in drug activity or they couldn't go out and do drugs and they couldn't go out and prostitute themselves to other people to get money to buy their drugs.

This is the information that they talked about between themselves on their cell phone messages.

To say that Mr. Longhini is the person who did that is a mischaracterization of what actually was taking place. So when we talk about what are the aggravating circumstances, the only aggravating circumstance here is, essentially is the fact that these girls were minors. Everything else they were participating in on their own volition.

The fact that they were minors and couldn't give consent to engage in sex, that's the law. But that doesn't necessarily mean that they couldn't participate in any manner that they wanted. And they did. Because they could control him to do anything they wanted.

As Ms. Bishop was saying, they would sneak

into her house at all times.  Mr. Longhini one time sent them a text message saying, he tells them don't come around my house, I don't want you to be here.  They ignored it because they knew that they could manipulate him and they kept on coming and coming and coming.

Ms. Bishop mentioned that there were police reports about the trespass and that they refused to stay away from the home.  They kept on coming.  It wasn't that Mr. Longhini was inviting them to come to the house.  He wasn't doing that at all.  They were doing it because they desired to do it, they wanted to do it.  They weren't threatened to do to, they weren't forced to do it.  They did it because they wanted to do it.  We find that an extremely important mitigating circumstance.

I think probably the most significant mitigating circumstance is the fact that Mr. Longhini has this brain damage.  The diagnosis that he's autistic, that he's been diagnosed with depression.  During his life time he attempted suicide on five different occasions, five different ways, I think.  He wasn't successful, obviously, with any.  That's got to show that he's got some serious issues, probably brought on by depression.  I think that's an extremely high mitigating circumstance.

The probation, or the pre-sentence report suggests that Mr. Longhini could go on probation for at

'22

least, it would be for IPS.  I don't think IPS is appropriate in these circumstances.  What Mr. Longhini would need, would be if he's going to get any type of probation, would be mental health probation.  Because he's got the issues that need to be addressed.  How many people know just exactly how to deal with a person who has autism.  So that takes professionals who know what's going on to take care of these particular issues.

We would ask the Court to give Mr. Longhini the least amount of incarceration possible.  We don't believe that his conduct certainly deserves an aggravated sentence.  We don't believe that the circumstances of the case warrant an aggravated circumstance.  The fact that he had 39 counts charged against him made his case very difficult to defend.

So Mr. Longhini has done the best that he could under the circumstances, and we ask the Court to take this into consideration.  Certainly you've learned that he does have the support of his family.  His father is deceased.  He's got his mother, his mother is elderly.

Eventually when Mr. Longhini gets released from prison he's going to have a guardian appointed by the court at some point in order to look out for him and to be on probation, obviously, during that time period.  But these things are significant mitigating circumstances and

23

we ask the Court to sentence him accordingly.  Thank you.

THE COURT:  Mr. Longhini, is there anything that you would like to say?

THE DEFENDANT:  Yes, Your Honor.  I'd like to lodge a couple of objections.

THE COURT:  Go ahead.

THE DEFENDANT:  But first, is it appropriate for me to request you put in an order applying me to apply for clemency?

THE COURT:  Your lawyer would have to make that motion.  If he does, I'll consider it.

THE DEFENDANT:  Okay.  I object to Arizona's lack of diminished capacity defense and subsequent lack of availability of a similar sentencing, similar sentencing regime comparable to United States sentencing guidelines 5K2.12 is a violation of my state rights under Arizona vs. Malone, 245 Arizona 3, and my sixth, eighth and 14th amendments federal rights.

Furthermore, I object to the Arizona statutes of which I'm charged under for the lack of constitutionally sufficient intent clause as compares to similar federal and other state statutes also is a violation of my sixth, eighth and 14th amendment federal rights.

Third, I object to Arizona's preclusion of

the diminished capacity as an affirmative defense or conflicting with the rights provided in the Americans with Disabilities Act, 42 USC 12132, which said that I must be allowed to present evidence of my disability in any proceeding.

And now as I read my statement to you I'd like you to see the things I've accomplished. May I approach the bench.

THE COURT: You can give it to your lawyer.

MS. FISHER: Your Honor, I haven't seen those documents either.

THE COURT: Have you seen them?

MS. FISHER: No, I haven't.

THE COURT: Mr. Di Pietro, can you show them to Ms. Fisher.

MR. DI PIETRO: Yes.

THE COURT: Go ahead.

THE DEFENDANT: Today is the first day of the rest of my life and I'm off to a good start. I've got room and board lined up for at least a decade, enough educational opportunity to get a PhD, and Maricopa County to thank for it. It may sound strange, but I'm truly grateful, I'm off drugs, I've got a new direction to go in. And even though I would have loved to see the doctors report about my brain damage before I got out on bond in

2016, the one thing that's negatively affected my life the most.

I know I'm a good person because since day one of having found out about why I do what I do, and what I've done, I've worked on making myself better.  But, God willing, and the Appellate Court too, I will be making the world a better place real soon.  Thank you.

Can I hug my mom?

THE COURT:  Mr. Longhini, I suspect you will want to keep these.  I've looked at them.  Thank you very much.

THE DEFENDANT:  Thank you.

THE COURT:  The plea agreement stipulates to a specific term for Count 5.  For Count 30 the term begins at the presumptive and goes up to 12 and a half, aggravated, and probation tails on all the other counts.

There are factors that pull in both ways in these cases.  Certainly Mr. Longhini's organic brain damage, he ultimately accepted responsibility.

At the same time, a lot of the mitigation is built into the plea.  The charges would have been astronomical at trial.  There are several victims, multiple offenses, they were children.  And I think to the extent there's some comparative participation, that also is built into the plea agreement.

So the Court will follow the stipulation as

to Count 5.   The Court finds that a partially aggravated term under Count 30, but not as much as the plea agreement allows.

So as to Count 5 it is the judgment of the Court that the defendant is sentenced to 13.5 years in the Department of Corrections to begin today with credit for 962 days.   Community supervision is waived.

As to Count 30 it is the judgment of the Court that the defendant is sentenced to seven years in the Department of Corrections to begin today with credit -- to begin after the sentence in Count 5.   Because it's a consecutive sentence there's no credit.   Community supervision is ordered.   The sentence for Count 30 is consecutive to the sentence for Count 5.

As to Count 7 it is the judgment of the Court that the imposition of sentence is suspended and the defendant is placed on life time supervised probation to begin upon his physical release from prison in Count 30.

As to Count 16 it is the judgment of the Court that the imposition of sentence is suspended and the defendant is placed on life time supervised probation to begin upon his physical release from prison in Count 30.

Let me go back, and this is in Count 30. Community supervision is waived.

As to Count 28 it is the judgment of the

Court that the imposition of sentence is suspended and the defendant is placed on supervised probation to begin upon his physical release from prison in Count 30.

As to Count 35 it is the judgment of the Court that the imposition of the sentence is suspend and the defendant is placed on life time supervised probation to begin upon his physical release from prison in Count 30.

The terms of probation for all counts will include sex offender terms, computer usage terms, and mental health terms, along with the other standard terms.

Mr. Longhini, you will get a written copy of all that and it's important that you go through them. And, if you have any questions, talk to your probation officer. Because these are three Class 3 felonies and one Class 2 felony. If you violate probation after these prison sentences, probation could be revoked and you could still be sent back to prison. The presumptive sentence for a Class 3 felony is three-and-a-half years, it can be as much as eight years and nine months. The presumptive prison sentence for a Class 2 felony is three-and-a-half years, and it could be -- let's see.

The plea agreement says, I just noticed, Count 35 is attempted use of minors for a drug offense, but wouldn't that be a Class 3 felony?

28

MS. FISHER:  Yes, Your Honor.  I thought we had corrected that.  I apologize.

THE COURT:  So the plea agreement is amended as to Count 35 and the Court's order is amended that the defendant is guilty of amended Count 35, attempted involving or using minors in a drug offense, a Class 3 felony.  So that all of your probation counts are Class 3 felonies.

There are monetary orders attached to Count 7.  There's a $65 a month probation service fee, a $250 sex offender registration fee, sex offender registration is required, a $20 probation assessment, a $20 time payment fee, a $2 victim's rights assessment, a $13 criminal penalty assessment to the Maricopa County Sheriff's Office, and a $50 assessment to the address confidentiality program.

As to Count 30 there's a $2,000 drug fine plus a surcharge, $3,660, a $20 time payment fee, and a $15 technical registration fee.

As to Count 35 there is a similar $2,000 fine plus the surcharge, $3,660, a $20 probation assessment, and a $20 time payment fee and a $15 technical registration fee.

I haven't set a beginning date for any of those payments.

Mr. Longhini, by pleading guilty in this case you waived your right to an appeal. You still have the right to file a Petition for Post-Conviction Relief. We'll give you some written information about that to take with you. You have to do that within 90 days or you could lose that right.

If you do file a notice within 90 days you're entitled to be represented by a lawyer and one will be appointed for you.

You're also entitled, after you complete the sentences for all these counts, to file a petition to set aside the conviction.

The Court does retain jurisdiction over restitution for one year.

Is there anything else that needs to be covered for the State?

MS. FISHER: No, Your Honor. Thank you.

THE COURT: Anything else for Mr. Longhini?

MR. DI PIETRO: No. Thank you, Your Honor.

THE COURT: The defendant is remanded to begin his sentence. Good luck, Mr. Longhini.

THE DEFENDANT: Thank you. Will you be handling my Post-Conviction?

THE COURT: I will.

THE WITNESS: Your Honor, last time you said I

30

could hug him.

THE COURT:  He's in custody.

* * * *

31

C E R T I F I C A T E

I, Gail E. Ferguson, Certified Reporter, do hereby certify that the foregoing pages numbered 1 through 30 inclusive, constitute a printed record of my stenographic notes taken at said time and place, all done to the best of my skill and ability.

DATED, at Phoenix, this 30th day of July, 2019.

\s\ Gail E. Ferguson

_____

Gail E. Ferguson, RPR

Certified Reporter (AZ50797)

FIRST PETITION

Anders V. Rosenquist, Bar #002724
**ROSENQUIST & ASSOCIATES**
**ATTORNEYS AT LAW**
42104 N. Venture Drive, Ste. A122
ANTHEM, AZ  85086
TELEPHONE: (480) 861-7115
rosenquistlegal@gmail.com
*Attorney for Petitioner*
*Ernest Longhini*

## SUPERIOR COURT OF ARIZONA
## MARICOPA COUNTY

| | |
|---|---|
| STATE OF ARIZONA,<br><br>                    Plaintiff,<br><br>vs.<br><br>ERNEST JOSEPH LONGHINI III<br><br>                    Defendant/Petitioner. | No. CR2016-000667-001<br><br>PETITION FOR POST- CONVICTION<br>RELIEF UNDER RULE 33<br><br>(Post-Conviction Relief Management Unit) |

Form 25 Information.

DEFENDANT.

Ernest Joseph Longhini III

Current Status: Incarcerated.

Sentence: 20.5 years in prison with lifetime probation.

Inmate No. 335286

GROUNDS FOR RELIEF – ISSUES.

1. A critical defense was not presented in Petitioner's case.

2. Violation of Petitioner's Right to Confront his Accusers.

3. Prosecutorial Abuse of Power.

4. Ineffective Assistance of Counsel.

5. Defective Plea.

RULE 33.1(e). Newly discovered material facts existed, and these facts would have changed the judgement and sentence in the case.

ACTION TAKEN. (1) Petitioner timely filed a Notice of Post-Conviction Relief and all extensions. (2) No previous Post-Conviction Relief Petitions have been filed. (3) No Habeas Corpus or Special Action proceedings have been filed. (4) No Federal Court proceedings have been filed.

RELIEF REQUESTED. Petitioner requests the Court set aside the convictions and dismiss the case, or in the alternative, set aside the convictions and order a new trial, or at a minimum, the Court should order a hearing to establish disputed facts.

## BACKGROUND

There were four girls involved in the case. The victims were assigned letters because they were 15 and older but under 18 years of age when the incidents occurred: 'A', 'B', 'C' & 'D'. 'A', 'B', & 'C' were sisters, 'A' & 'B' were twins, and 'D' was a girl who lived in the area where the sisters lived. A thirty-nine count Indictment was issued naming victims 'A', 'B', 'C' & 'D', (hereinafter "victims" or "girls"). All the charges were based on statements made by the victims in interviews by the police. In the Indictment the offenses with victims, 'A', 'B', & 'C', (hereinafter "sisters"), were alleged to have occurred within a ten-month period of time, and with 'D' the offenses were alleged to have occurred within a three-year period of time. During the time of the offenses, victims 'A', 'B', & 'C' were 15 years old and older, and victim 'D' was 15 to 17 years old. Each count alleged a single incident with a victim. The Indictment alleged nineteen counts of misconduct with

-2-

victim 'A', nine counts of misconduct with victim 'B', four counts of misconduct with victim 'C', and four counts of misconduct with victim 'D'. The charges consisted of selling, supplying, or injecting illegal drugs, sexual contact, pornography, or prostitution, with a minor.

## SUMMARY

All the victims had a history of addiction to illegal drugs, (hereinafter, "drug[s]"), stealing, and arrests and court interactions, and being on probation.

The case against Petitioner was initiated when victim 'A' was stopped by a police officer walking away from Petitioner's home. She was questioned by the officer and told him a litany of offenses she had been involved in with Petitioner. Petitioner was arrested and his house searched. The sisters and 'D' were questioned by the police. They told stories about different things that happened when they were with Petitioner.

All the sisters had been addicted to drugs before they met Petitioner, and when they met him they realized he had mental problems and could be easily manipulated. They talked him into letting them come to his house at any time and do drugs in his bedroom. They convinced Petitioner to let them do this by befriending him and giving him companionship. They also told Petitioner their dad was violent and when he threatened them, they needed a place to stay. The girls would run away from home and stay in Petitioner's bedroom.

When the sisters went to his house, and Petitioner's mother was gone, they would steal things, including Petitioner's medication, Adderall, a controlled substance, his mother's credit cards, jewelry, and other valuables. When she realized what they were doing she contacted the victims' mother about 'B'. In a text Petitioner's mother stated, *"Knocking. She has stolen before, so she is not welcome back. My money and possessions are for my family.* The girl's mother replied, *"Please do not let her in your house I am very*

-3-

*sorry please tell your son to not have any contact with her. I know he doesn't want to be mean to her but she will take advantage of any one she can right now."... "They are addicts and it is truly sad I never thought this would be our life as parents my husband and I are trying to work on her at least she has come home but can't say much else obviously."... "I will get them back if I see her as I said she has not come home I have police looking for her."... "If she shows up at your home please call the police she has a warrant for breaking the terms of her probation she also is a runaway."*

In a text to Petitioner's mother from a person who knew the sisters, he warned her about them. The text stated, "*I have respect for you. So im (sic) deciding to tell you this, ("B") is taking advantage of your son (Petitioner) to the max. I have a lot of information. If you would like to hear more, let me know. It's hard to watch so i (sic) need to say something. Chi*".

When the sisters kept going to Petitioner's house and stealing things, Petitioner's mother filling an "Injunction Against Harassment" against victim "A", (Arrowhead Justice Court, Surprise Arizona, Case No. CC2017027262000). It did no good, they still manipulated Petitioner into letting them come to the house, do drugs, and steal things. Petitioner's mother testified at his sentencing they stole over $30,000.00 worth of her valuables.

## ISSUES

### I.    A CRITICAL DEFENSE OF GUILTY EXCEPT INSANE PURSUANT TO A.R.S §13-502 WAS NOT RAISED IN PETITIONER'S CASE.

Petitioner had a brain injury at birth and at six weeks had a high fever for a prolonged period of time which caused permanent brain damage. Four psychological evaluations were done on Petitioner. Three by Dr. Col, who evaluated him three times starting at age 15, and one by Dr. Blackwood who was appointed by the court to evaluate him in relation to the charges. The evaluations diagnosed Petitioner with multiple disabilities: Bipolar, ADHD,

-4-

Retardation, Autistic tendencies, and, 'comparable to a person with Alzheimer's disease'. The evaluations stated that Petitioner has normal skills in some areas and disabilities in others. The doctors stated Petitioner had a severe disability in social skills, which Dr. Col described as being "clueless" in interpersonal relationships. Health officials in the State of Oregon recommended he be institutionalized.

[a]. A defendant has a Constitutional right to present a defense.

The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 1045 (1973). "[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense." *Nevada v. Jackson*, 569 U.S. 505, 509, 133 S. Ct. 1990, 1992 (2013), citing *Crane* v. *Kentucky*, 476 U.S. 683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986).

Due process rights are guaranteed in the Arizona Constitution at Article 2, Section 4: "No person shall be deprived of life, liberty, or property without due process of law." This guarantee is congruent with the U.S. Constitution, Amendments 5 and 14. *State v. Herrera-Rodriguez*, 164 Ariz. 49, 52, 790 P.2d 747, 750 (App.1989). Due process of law is the primary and indispensable foundation of individual freedom in our legal system. *Application of Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).

The Arizona Supreme Court has held that denial of due process is a denial of fundamental fairness, shocking to a universal sense of justice. *Oshrin v. Coulter*, 142 Ariz. 109, 688 P.2d 1001 (1984). If a trial court excludes essential evidence, thereby precluding a defendant from presenting a theory of defense, the trial court's decision results in a denial of the defendant's right to due process that is not harmless. *Id.*, 142 Ariz. at 111, 688 P.2d at 1003.

[b]. A.R.S §13-502 (A), provides an affirmative defense. It states, "A person may be found guilty except Insane" if at the time of the commission of the criminal act the

person was afflicted with a mental disease or defect of such severity that the person did not know the criminal act was wrong", and ... "A mental disease or defect constituting legal insanity is an affirmative defense."

[c]. The examinations of Petitioner by Dr. Col and Dr. Blackwood show that, in Petitioner's case, he did not know the acts he is alleged to have committed were wrong.

1. Dr. Col evaluated Petitioner three times from age 15. Dr. Blackwood evaluated him in relation to the charges in the case.

2. Dr. Blackwood administered numerous tests, examined medical records, court records, police reports, statements of the victims, statements of Petitioner, and interviewed Petitioner three times for the evaluation.

3. Dr. Blackwood, in his report, included refences to Dr. Col's report and agreed with his evaluations of Petitioner.

4. Dr. Col and Dr. Blackwood's reports concluded Petitioner had significant brain damage from his injury at birth and from a sustained high fever at age 6 weeks, and the brain injury caused cognitive problems that affected his abilities in certain skills. Among those skills was his inability to understand and deal with 'social relationships.'

5. Dr. Blackwood and Dr. Col concluded that in a social relationship, like the one Petitioner was in with the victims, Petitioner could be manipulated into doing things the victims' wanted him to do, that could be considered illegal, without knowing he was doing anything wrong. He was described by Dr. Col as being "clueless" in these relationships, and by Dr. Blackwood as, "dealing, at best, with peers" in the relationship with the victims, and agreed with Dr. Col's description.

6. Both doctors concluded, in areas of non-social cognition Petitioner could perform at normal levels.

7. In his interview of Petitioner, Dr. Blackwood pointed out an example of his disability, ... "Mr. Longhini in interview with investigation officers reflects obvious

-6-

confusion. He admits to inappropriate interactions with one of the alleged victims that the victim herself denies."

8. Excerpts from Dr. Blackwood's report.

# NEUROPSYCHOLOGY ASSOCIATES, P.C.
### 1515 EAST MISSOURI AVENUE, #110
### PHOENIX, ARIZONA 85014

H. Daniel Blackwood, Ph.D., ABPP
Board Certified in Clinical Neuropsychology

Appointments available in Prescott

PHONE: (602) 230-8324
FAX: (602) 274-7402

## INDEPENDENT NEUROPSYCHOLOGICAL EVALUATION

Name:       Ernest Joseph Longhini III
            CR2016-000667-001

Age: 32
Date of Birth: January 31, 1986
Education: GED
Tests Administered: Performance/Symptom Validity Tests, Aphasia Screening Tests, Clock Drawing Test, Wechsler Memory Scale-Fourth Edition (WMS-IV) (Stories), Hopkins Verbal Learning Test-R, Similarities subtest of the Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV), Rey Complex Figure (immediate production and memory), Stroop Color-Word Test, Affect Naming subtest of the Advanced Clinical Solutions, Problems in Everyday Living Test (PEDL), Social Responsiveness Scale (SRS-2), Autism Questionnaire (AQ), MCMI-III
Referred by: Brian Di Pietro, Esq.
Places of Evaluation: Phoenix Office and Maricopa County Courthouse
Dates of Evaluation: January 15, 2018, January 23, 2018, January 24, 2018.

History from Records

Information from records provided by Mr. Longhini's mother, Ms. Erin Bishop, includes the following.

Mr. Longhini's responses to a structured behavioral questionnaire indicated serious problems with social functioning. He was described as feeling threatened and potentially overwhelmed by social interactions. He was described as being inhibited, introverted, having problems with family conflict, issues of sexual insecurity and/or discomfort, and poorly controlled acting-out tendencies.

-7-

On the SRS-2 Mr. Longhini's responses reflect severe deficiencies in reciprocal social behavior which would lead to severe and enduring interference with everyday social interactions. His results are similar to individuals with a diagnosis of autism. His responses reflect difficulty in perceiving social cues and severe difficulty in interpreting such cues, along with difficulties in social communication, social motivation, and in exhibiting restricted interests and repetitive behaviors.

Mr. Longhini's responses to the AQ reflect a high probability of a diagnosis on the autistic spectrum.

When Mr. Longhini was 15 years old, the examining psychologist wrote that he had "a very strong tendency to misperceive events and form mistaken impressions of people and what their actions mean. As a result, he tends to be quite impaired in his social perceptions, quite vulnerable to misperceiving what other people are thinking or feeling, and to have little idea why they act in the ways they do." It was noted that he was "quite vulnerable to engaging in inappropriate social behaviors, and/or maladaptive social interactions." At that time the examining psychologist, Dr. Col, rendered diagnoses of cognitive disorder NOS, with a prominent disturbance of social relations; attention deficit/hyperactivity disorder, predominantly inattentive type; dysthymic disorder, and relational problems secondary to organic brain dysfunction.

When Mr. Longhini was examined again at the age of 25, Dr. Col described Mr. Longhini as essentially "clueless" in the interpersonal realm, with difficulties in the perception of vocal rate and tone, facial expression, body language, etc. Dr. Col again attributed this to brain damage suffered at the time of the perinatal stroke and/or high fever at the age of six weeks. He rendered diagnoses of ADHD, combined type, severe; mixed receptive-expressive language disorder, and cognitive disorder NOS. He noted that Mr. Longhini also exhibited abnormalities on a quantitative EEG. He indicated that it would be very difficult for Mr. Longhini to "ever be able to make his way in life without substantial ongoing assistance from outside resources."

The results of the current examination confirm previously identified problems and document their ongoing, chronic nature. While Mr. Longhini performs within normal limits on tasks of non-social cognition such as registration of verbal material and verbal abstraction, his verbal expression of judgment is in the deficient range compared to healthy elderly subjects and in the average range compared to individuals with a diagnosis of Alzheimer's disease.

Mr. Longhini's responses to structured behavioral questionnaires indicate difficulties in social interactions similar to those of individuals on the autistic spectrum. His social cognition and his ability to maintain socially acceptable interpersonal conduct are deficient or incompetent. He is extremely insecure in interpersonal interactions and interpersonal relationships, and he tends to interact with those whose approval he seeks in an obliging and submissive manner. He repeatedly seeks reassurance from others and has an intense fear of separation from those whom he sees as providing support. He is vulnerable to exploitation and abuse. He may experience delusional and paranoid thinking at times, and he believes that he has been betrayed or forsaken by persons whose support he had hoped to gain.

Mr. Longhini's behavior in interview with investigating officers reflects obvious confusion. He admits to inappropriate interactions with one of the alleged victims that the victim herself denies.

-9-

His statements reflect emotional immaturity and emotional confusion. In his interactions with the described victims, from a social and emotional standpoint, he was, in effect, dealing, at best, with peers.

One certainly cannot rule out the possibility that Mr. Longhini is magnifying problems or responding in a self-serving manner, but, once again, documentation of Mr. Longhini's emotional and social deficiencies was initially accomplished many years before the events in question.

Mr. Longhini's mother, while also possibly presenting information in a manner intended to be circumstantially helpful to Mr. Longhini, describes his behavior in a manner consistent with clinical information.

H. Daniel Blackwood. Ph.D.

_____

Excerpts from Dr. Col and Dr. Blackwood's evaluations.

a. Dr. Col, 9/12/2001, (age 15), "... Stroke at birth... fever six weeks old... cognitive disorder... organic brain dysfunction... quite impaired in his social perceptions... quite vulnerable to misperceiving what other people are thinking or feeling, and have little idea why they act in the ways they do... unable to understand the intentions, motivations, or actions of others... quite vulnerable to engaging in inappropriate social behaviors."

b. Dr Col, 7/1/2011, (age 25), "... Did well on occupational tasks... (but) essentially 'clueless' in the interpersonal realm... difficulties in perception of vocal rate and tone, facial expression, body language... attribute these problems to brain damage... very difficult for Mr. Longhini to ever be able to make his way in life without substantial ongoing assistance from outside resources."

c. Keith Breswick, (7/12/2013), Civil Commitment Coordinator for the State of Oregon Health Authority, "... there was a recommendation of civil commitment of Mr. Longhini based on a finding of probable cause that he was a mentally ill person."

d. Dr. Blackwood, "... Significant deficiencies in reciprocal social behavior which would lead to severe and enduring interference with everyday social interactions... difficulties in

-10-

perceiving social cues and severe difficulty in interpreting such cues... current examination confirms previously identified problems, (Dr. Col's report), and their ongoing chronic nature... Mr. Longhini performs within normal limits on tasks of non-social cognition... (but) difficulties in social interactions similar to those of individuals on the 'autistic spectrum'... He is vulnerable to exploitation and abuse."

e. Dr. Blackwood, "... Mr. Longhini's behavior in interview with investigating officers reflects obvious confusion. He admits to inappropriate interactions with one of the alleged victims that the victim herself denies. His statements reflect emotional immaturity and emotional confusion... Mr. Longhini's mother describes behavior in a manner consistent with clinical information."

f. Dr. Blackwood, "... In his interactions with described victims, from a social and emotional standpoint, he was, in effect, dealing, at best, with 'peers'... documentation of Mr. Longhini's emotional and social deficiencies was initially accomplished many years ago before the events in question, (Dr. Col's reports)".

g. Nowhere in Dr. Col or Dr Blackwood's reports did they state Petitioner was dangerous or a violent person.

An important distinction in Petitioner's evaluations needs to be made to understand how it relates to his behavior. The distinction between Petitioners 'normal' abilities in certain areas, and his disability in social areas. The doctors addressed Petitioner's interpersonal relationship with the victims. Dr. Col describe him as being "clueless" in this type of relationship, and Dr Blackwood described him as being, "dealing, at best, with peers" in his relationship with the victims, - As opposed to his skills in other areas, to wit, his skills in understanding computers.

Dr. Blackwood's diagnosis described Petitioner as being on the 'Autistic spectrum'. A person who has Autism, (on the Autistic spectrum), can display conflicting behavior; Be disabled in some skills, normal in certain skills and very bright in other skills. (*See 60 minutes T.V. segment on Autism, aired October 2, 2020*), that shows Autistic young adults

displaying brilliant skills, and explains the different abilities and disabilities an Autistic people can have. (*See also, NeuroTribes, The Legacy of Autism and the Future of Neurodiversity*), a book written by Steve Silberman, (New York Times bestseller), which explains Petitioner's problem; Why he appears and acts normal in certain situations, and can perform normal skills, yet in other situations he has no clue what is going on.

Regardless of the victims' statements, and Petitioner's statements to the police, Petitioner's Autistic disability explains his relationship with the victims: How they could manipulate him into doing things that would be considered illegal, by telling him they like him and were his friends, and made romantic overtures, and; How he perceived these things as consensual, and that he was doing nothing wrong when he did what they asked him.

Conclusions in Petitioner's Rule 11, 'Competency to Stand Trial' evaluations, that found Petitioner competent to stand trial, do not apply in determining the issue of 'Guilt except Insane'. The conclusions are limited in scope, and only focus on a particular ability, Petitioner's ability to understand court proceedings.

Dr. Blackwood did not offer an opinion that, in the circumstances of Petitioner's case, he did not know his actions were wrong, because he was not requested to answer that specific question. However, he referred to the police report in Petitioner's case and pointed out an example of Petitioner's disability in the report. He stated, Petitioner admitted doing things the victims said he did not do.

Based on the diagnosis and conclusions in Dr. Col and Dr. Blackwood's reports, there is more than enough evidence to support the defense of 'Guilty except Insane' in A.R.S. §13-502, and Petitioner has a Constitutional right to present this defense. Therefore, based on the facts presented, the court should reverse Petitioner's convictions, and dismiss the case, or in the alternative, a new trial ordered, or at minimum, a hearing should be held where Dr Col and Dr. Blackwood can testify, to explain their findings and offer an opinion on whether Petitioner knew the alleged acts were wrong.

## II.    PETITIONER'S CONSTITUTIONAL RIGHT TO CONFRONT HIS ACCUSSERS WAS VIOLATED.

The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process. *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 1045 (1973). The right of cross-examination is more than a desirable rule of trial procedure; it is implicit in the constitutional right of confrontation and helps assure the "accuracy of the truth-determining process." *Id.*, citing *Dutton* v. *Evans*, 400 U.S. 74, 89 (1970).

Concomitant with the Arizona Victim's Bill of Rights, the defendant has a due process right, under the federal and Arizona constitutions, to present a defense. *State ex rel. Romley v. Superior Court*, 172 Ariz. 232, 236, 836 P.2d 445, 449 (Ct. App. 1992), citing *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). The Arizona Victim's Bill of Rights should not be a sword in the hands of victims to thwart a defendant's ability to effectively present a legitimate defense. *Id.* at 241, 836 P.2d at 454. Nor should it be a fortress behind which prosecutors may isolate themselves from their constitutional duty to afford a criminal defendant a fair trial. *Id.*

The only direct evidence in the case was the statements made by the victims in interviews by the police. Their statements, the basis for the charges, are suspect and questionable because of the victims' background of lying to the police and others, when dealing with their drug addiction and stealing.

[1] Victim 'A'. The first 19 counts in the Indictment were based on statements made by victim 'A' in her interview by the police. Victim 'A's (video) interview was done in the afternoon of the same day she said she had taken a large amount of Heroin in the morning. At the beginning of the interview she started crying and begged the officer not to make her go through the interview and to let her go to rehab. The interview lasted an hour and a half. At the end of the interview she cried when she was told she had to be examined by a nurse

-13-

before she could leave. During the interview she appeared to be going through withdrawal, (since the effects of the drug she took that morning had worn off). She made the following comments during her interview: She started using Heroin at age 13; She used drugs before she met Petitioner; She never had sex with Petitioner, and; - She was confused.

[2] Victim 'B'. The next 9 counts, 20 to 28, in the Indictment were based on statements made by victim 'B' in her interview by the police. (She was in a treatment facility recovering from drug addiction when she was interviewed). She made the following comments during her interview: She was on probation, and, - It was easy to manipulate Petitioner. She admitted to stealing to support her drug addiction. *(See also),* statements made by her mother (set out previously) that show she was a chronic thief, who lied and stole to support her drug habit.

[3] Victim 'C'. Charges 29, 30, 31, & 34, in the Indictment were based on statements made by victim 'C' in her interview by the police. In her interview she stated the following: She was on probation; She did not have much knowledge of what her sisters, 'A' & 'B' did with Petitioner, and what she did know was what they told her; She was addicted to Heroin before she met Petitioner; She did not had sex with Petitioner; She ran away from home and stayed in Petitioner's bedroom for several days because if she went home her mother would call the police and turn her in for violating probation; Petitioner would talk about marrying 'A'; All he (Petitioner) wanted was companionship; She got drugs from a drug dealer named Rickey; She would shoplift at Walmart, Target, Lowes, etc.; She would hang out with ten people in the neighborhood who would do drugs and got high, and; Petitioner would say he wanted 'A' to be his wife.

[4] Victim 'D'. Charges 32, 33, 35, & 36, were based on statements made by victim 'D' in her interview. In her interview she made the following comments: She was a methamphetamine addict and had been in drug rehabilitation; Petitioner was weird and had a mental problem but was nice, and they smoke drugs together; Petitioner said 'all he

-14-

wanted was someone to love him'; She did not have sex with Petitioner, and – during the interview the officer said, "Joe (Petitioner) was going to be a CI, (Confidential Informant), but it fell apart".

All the victims had a motive to lie in their interviews, to protect themselves from getting in trouble for crimes they had committed. The police officers that interviewed them told them they would not get in trouble for crimes they admitted to doing, in the interview. They took advantage of this by naming, in general terms, crimes they committed, back to the time they first got involved with drugs. They knew they could do this because the officers were focused on getting evidence against Petitioner and would not challenge them on the accuracy or truthfulness of the crimes they admitted to, as long as they gave the officers what they wanted, crimes they said they committed with Petitioner.

In their interviews, the victims were confronted with a situation where they had to explain why, for almost a year, they would voluntarily go to Petitioner's house and do illegal drugs, and how Petitioner caused them do this, and caused them to steal, and caused them to be prostitutes, as alleged in the charges. The victims were not naive, they knew if they gave the officers enough information, false or otherwise, blaming Petitioner for their crimes, they would not get in trouble, and their truthfulness would not be questioned. It was easy for the victims to lie about what happened with Petitioner because they were the only witnesses to what actually happened with Petitioner besides Petitioner, who would not be believed.

If the victims had been advised of Petitioner's mental problems, and been questioned about them, as to Petitioner's statements and behavior, information could have been developed that supported Dr. Col and Dr. Blackwood's opinions of Petitioner's mental problem, that he was "clueless" in their relationship, and that he was, "... dealing, at best, with peers", in their relationship.

-15-

Petitioner's right to confront his accusers was also violated when he could not challenge the investigating police officer with his mishandling of the case. The officer ignored all the indications that showed the case against Petitioner was weak and could be filled with falsehoods yet create a case against him that was meant to distort the facts and weaknesses in the case, to insure an unfair conviction.

The investigating police officer, the Case Agent, had 15 years of experience in narcotics enforcement, so he had to know the victims could be lying because of their history and previous experience with police, but accepted their statements as true, and strong enough to support charges, without questioning their credibility. Also, with the officer's experience he had to know people using drugs will consistently lie to keep from getting caught, yet he ignored this and did not question the victims' credibility.

In the officer's interview of Petitioner, he had to recognize discrepancies in his story, like when he admitted to things the victims said he didn't do. (*See* Dr. Blackwood's report). Yet he ignored these indicators and did not investigate the possibility that there was something mentally wrong with Petitioner. Even Petitioner's attorney noticed something was mentally wrong with Petitioner when he talked to him and filed the motion that led to the Court ordering a mental examination of Petitioner.

Also, the officer knew the victims' statements could not be questioned as to their truthfulness because the law protects victims from being questioned, and that Petitioner would have had to go to trial in order to question the victims as to the truthfulness of their statements. Without being able to question the victim's credibility, Petitioner had no defense and had to plead guilty to avoid facing a substantial amount of time in prison.

The office ignored substantial evidence the victims could be lying, to reach the goal of convicting him. The only explanation for the officer, a seasoned police officer, to ignore all these factors, has to be that he had made up his mind early on Petitioner was a bad guy and had to be convicted.

Petitioner's right to confront his accusers was violated when there was a legitimate issue of the victims' truthfulness about what happened in the incidents that led to the charges, and that Petitioner was unable to challenge the victims' truthfulness before pleading guilty. Petitioner's right to confront his accuser was also violated when he was unable to confront the police officer with his mishandling of the case.

Therefore, the court should find Petitioner's right to confront his accusers was violated, and set aside the convictions and dismissed the case, or in the alternative remand the case for a new trial, or at a minimum, order a hearing where the victims can be questioned on their truthfulness, and the officer can be questioned on his motive.

## III.    THE PROSECUTOR COMMITED PROSECUTORIAL ABUSE OF POWER.

So long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charges to file or bring before a grand jury, generally rests entirely in his discretion. *Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S. Ct. 663, 668 (1978). The prosecutor has a professional duty not to charge a suspect with crime unless he is satisfied of probable cause. *Gerstein v. Pugh*, 420 U.S. 103, 121 n.22, 95 S. Ct. 854, 867 (1975). The prosecutor has a duty to measure the facts in the report by legal standards and decide whether they add up to probable cause to prosecute. *Smiddy v. Varney*, 803 F.2d 1469, 1472 (9th Cir. 1986). The possibility of less than perfect investigative conduct on the part of the police is no doubt one reason the law requires an exercise of the prosecutor's informed discretion before the initiation of prosecution. *Id.*

The prosecutor abused their discretion in Petitioner's case. The prosecutor accepted the investigating officer's conclusion, tacitly or otherwise, that Petitioner was a bad person without questioning it. If the prosecutor had objectively reviewed the interviews of the victims' and investigated their background, the victims' history of drug abuse, stealing,

-17-

and lying to police, would have become apparent, and would have raised questions about weaknesses in the case.

The police officer's lack of questioning the victims as to their credibility and ferreting out lies, raised questions of his credibility. The prosecutor ignored this and deferred to the officer's conclusions. Also, with the victims' background of arrests, charges, incarceration, and probation, it had to be obvious there was a reasonable likelihood the victims could be lying about Petitioner's guilt in a number of the incidents that lead to the charges. Yet the prosecutor accepted the victims' statements as the true, and strong enough to support the charges.

The prosecutor knew Petitioner could not challenge the weaknesses in the victims' statements because the victims had the right to refuse to be interviewed by the defense. The prosecutor charged 39 counts with enhancements so the victims would not be subject to a trial, where their lies could be exposed.

The prosecutor used each incident the victims related as a single charge and alleged the incident occurred within a ten-month period of time, which made it impossible for Petitioner to defend against the charges. This put the Petitioner in a position of having to enter an involuntary plea.

Based on information the prosecutor knew or should have known about the victims' lack of credibility, and accepting the officer's conclusion, and filing an excessive amount of charges to make the case impossible to defend and force a plea, is Prosecutorial Abuse of Power.

The prosecutor had to know the victims' statements blaming Petitioner for their misconduct were inconsistent with the facts of the case: The victims were addicted to illegal drugs long before they knew Petitioner; They obtain their drugs from a dealer in their neighborhood; They took Heroin, Cocaine, and Methamphetamines at gatherings of groups of people in the neighborhood that were addicted to drugs; They would steal to get

money to buy drugs; They were part of a group to people that would steal to get drugs, and; Stealing was the only way they could get money to buy drugs because they did not work and had dropped out of school. The prosecutor ignored these facts and took the position that the victims' statements were true enough, believable enough, and strong enough to base charges on. This is prosecutorial abuse of power.

The prosecutor ignored the fact that the victims created and used the situation with Petitioner for their benefit. When the victims met Petitioner, they realized he had mental problems they could take advantage of; They convinced him to let them use his bedroom to do drugs and crash, and; his bedroom was a convenient and safe place where they would not get caught doing drugs. Yet the prosecutor ignored these facts.

If the prosecutor had objectively reviewed the interview of Petitioner it would have been found that there was something mentally wrong with him, like when he said he did things the victims said he did not do. Yet the prosecutor did not consider the possibility Petitioner had mental problems before filing charges.

After defense counsel interviewed Petitioner, he concluded there was something mentally wrong with him and filed a motion to have him examined, which the court granted. The prosecutor did not reconsider the charges after Dr. Blackwood's examination was concluded and provided to counsel.

Petitioner's mother advised the investigating officer of Petitioner's mental health problems and offered records showing his history of mental illness, (Dr. Col's evaluations), and discussed Petitioner's mental illness in an interview with the officer. Yet the officer ignored this information and did not investigate further. The prosecutor had to know from communications with the officer, the interview of Petitioner's mother, and Dr. Col and Dr. Blackwood's evaluations, Petitioner had a serious mental health problem, but ignored it.

A prosecutor has a responsibility to question a police officer's conclusions and the accuracy of the evidence the officer presents in his report, before filing charges. Yet the

prosecutor accepted the police officer's conclusion that Petitioner was a bad guy and proceeded to file charges.

By filing all possible charges, no matter how weak or unsupported they were, and by alleging each incident as a separate charge; and by alleging each charge occurred over a ten-month period of time, the case was rendered indefensible by Petitioner, and force a plea. The prosecutor's misconduct and the police officer's misconduct coupled with Petitioner's inability to question the victims before having to plead guilty, insured a conviction. This is Prosecutorial abuse of power.

The prosecutor knew filing a large number of charges of sexual misconduct with minors would get media attention, (The case was carried by national media), would further ensure a guilty plea. The publicity demoralized Petitioner and prompted a plea. Considering the prosecutor's intent to do everything possible to get Petitioner to plead guilty without exposing the victims' lack of credibility, and the prosecutor's collusion with the police officer to get a conviction, clearly shows prosecutorial abuse of power.

But for the prosecutor's abuse of power the outcome in the case would have been different. Therefore, the court should set aside the convictions and dismiss the case, or in the alternative set aside the convictions and remand the case for a new trial, or at a minimum order a hearing be held where the victims' credibility can be questioned, and the prosecutor and police officer's motive and conduct can be questioned.

IV.    **IT WAS INEFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL DID NOT RAISE THE DEFENSE OF PETITIONER'S MENTAL HEALTH IN LITIGATION OF THE CASE.**

Generally, claims of ineffective assistance of counsel are analyzed pursuant to *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In order to prevail on such a claim, Petitioner must show: (1) deficient performance - counsel's representation fell below the objective standard for reasonableness; and (2) prejudice -

there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 687-88; *see also State v. Bennett*, 213 Ariz. 562, ¶ 21, 146 P.3d 63, 68 (2006) ("To state a colorable claim of ineffective assistance of counsel, a defendant must show both that counsel's performance fell below objectively reasonable standards and that this deficiency prejudiced the defendant."). In the context of a guilty plea, "in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985). "[W]here the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial." *Id.*

Petitioner's counsel requested and the Court ordered Petitioner be evaluated for mental health problems that could affect the case. Dr. Blackwood was appointed to perform the evaluation. The evaluation was completed but counsel only used it for mitigation of Petitioner's sentence. Dr. Col and Dr. Blackwood's reports explain what happened with Petitioner. His cognitive disability made him unable to know and understand what he allegedly did was wrong. Counsel was ineffective when he did not recognize and pursue the mental health issue in Petitioner's case raised in Issue [I] of the Petition. Dr. Blackwood's report set out facts and conclusions that supported the defense in A.R.S. §13-502, 'Guilty except Insane'. The report explained Petitioner's behavior in relation to the charges against him. Counsel did not do the necessary research and investigation to find the defense in A.R.S. §13-502. Counsel stopped looking for a defense related to Petitioner's mental health problem when the defense of 'Diminished Capacity' was not allowed. The defense was critical to show Petitioner was not responsible for the crimes he allegedly committed, because he did not know the acts he was accused of committing were wrong.

-21-

Competent counsel would have realized the social situation the victims created with Petitioner was exactly the situation described in Dr. Blackwood's report. Dr. Blackwood's report even linked Petitioner's mental illness to the police report that showed there was something wrong with Petitioner. Dr. Blackwood's report stated, 'When Petitioner was interviewed by the police, he admitted to doing things the victim did not say he did'.

Counsel should have recognized the charges alleging Petitioner caused victim 'A' to prostitute herself were not supported by her interview, which would have alerted him to the possibility other charges were not supported. Also, as to the prostitution charges, independent evidence shows it is more likely the victims were prostituting for their own benefit, to get money to buy drugs, since they did not work. *See* Postings in 'Facebook' supporting this conclusion. A photograph of one of the victims displaying her breasts, and one having sex. (Because of the victims are minors, the photographs can be submitted under seal if requested).

Counsel was ineffective for not recognizing another reason the defense was crucial, it undermined the State's case. It would show the conduct set out in the victims' statements came within the scope of Dr. Col and Dr. Blackwood's diagnosis, Petitioner had a severe mental problem with understanding and dealing with social situations like the one with Petitioner and the victims. Dr. Col stated Petitioner was 'clueless' in this type of situation, and Dr. Blackwood stated, Petitioner was 'dealing, at best, with peers' in the relationship with the victims.

The importance of the defense of 'guilty except Insane' cannot be minimized. Petitioner had a severe brain damage that affected his cognitive abilities in the area of social relationships, and because of this he did not know he was being manipulated by the victims, who created the relationship. Therefore, he did not consider the alleged acts he is accused of committed were wrong.

If counsel had litigated the defense in A.R.S.§13-502 during pretrial proceedings a disposition could have been reached where Petitioner would have been placed in a mental health institution, and been treated, rather than put in prison. This would have been a realistic resolution, because Dr. Col and Dr. Blackwood did not find any evidence Petitioner was a danger to society, or a violent person.

If counsel had raised the defense of "Guilty except Insane" in Petitioner's case, the outcome would have been different. Counsel's negligence for not litigating the critical defense in A.R.S. §13-502 amounted to Ineffective Assistance of Counsel. Therefore, Petitioner requests the court set aside his convictions and dismiss the case or in the alternative set aside his convictions and order a new trial or at a minimum order a hearing where the issue of Ineffective Assistance of Counsel can be litigated.

## V.    THE PLEA ENTERED BY PETITIONER WAS DEFECTIVE.

In addition to a duty to investigate, defense counsel must ensure that the defendant understands his plea. *Smith v. Mahoney*, 611 F.3d 978, 988 (9th Cir. 2010). A defendant must possess "an understanding of the law in relation to the facts." *Boykin v. Alabama*, 395 U.S. 238, 243 n.5, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969). A guilty plea is only valid if it "represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970), Petitioner's defense attorney did not ensure that he fully understood the alternative courses of action available to him.

Petitioner's plea was defective because he was unaware of the defense of "Guilty except Insane" in A.R.S §13-502. If the defense had been litigated, the case would have changed in Petitioner's favor. He would have faced a better result because the case against him would have been much weaker, and possibly dismissed, or there could have been a plea where he would have been placed in a mental health facility instead of prison.

-23-

If Petitioner had known about the defense of 'Guilty except Insane' he could have elected to go to trial, where there would have been a realistic possibility of a favorable verdict, because he would have not only been able to present evidence of his mental disability in the situation with the victims, he would have be able to present evidence of the victims' lack of credibility.

The plea was defective because of the misconduct of the prosecutor and police officer in conspiring, tacitly or otherwise, to force a plea. They built a case against Petitioner that could not be defended. They were aware of the weaknesses in the victims' statements, so they had to make sure a plea would be entered, so the weaknesses in the case would not be exposed.

The plea was defective because the prosecutor kept the defense from challenging the credibility of the victims before Petitioner had to enter a plea. If counsel had been able to question the victims, he would have been able to show the weaknesses in the victims' statements and the misconduct of the prosecutor and police officer.

Petitioner's plea was defective because it was not knowingly, intelligently, and voluntarily entered. Therefore, the court should set aside Petitioner's convictions and dismiss the case or in the alternative set aside the convictions and order a new trial or at a minimum order a hearing where Petitioner can present evidence to support a finding of a defective plea.

## VI.    CONCLUSION.

Petitioner's mental state calls into question the very foundation of the State's case. Petitioner's mental state during his relationship with the victims gave rise to all the charges in the case. The defense in A.R.S. §13-502, "Guilty except Insane" would have undermined the State's case. Petitioner not only has a statutory right to the defense he has a Constitutional right to present the defense, the defense of not knowing the acts he is alleged

-24-

to have committed were wrong. The evaluations of Dr Col and Dr. Blackwood provide a credible basis for the defense.

If the defense had been litigated in pre-trial proceedings, there is more than reasonable probability the outcome in the case would have been different, more favorable to Petitioner. The victim's statements about what happened with Petitioner would have been nullified because Petitioner did not have the required intent to make the acts criminal. The only witnesses to the alleged crimes were the victims, and Petitioner who would not be believe. The victims only had to change their story slightly about what happened with Petitioner to place the blame him. There were no witnesses to what 'actually' happened in Petitioner's bedroom except the victims and Petitioner, so it would be easy to describe what they did in a way that placed the blame on Petitioner.

It is clear from the victims' statements, they were addicted to illegal drugs before they met Petitioner; They needed a safe place to do their drugs; They realized Petitioner had a mental problem and could be easily manipulated; They convinced him to let them use his bedroom to do their drugs, and; If they got caught they would be able to blame Petitioner for their misconduct.

When the victims were put in a position where they were confronted by the police, they had a strong motive to lie, to keep from getting in trouble, and the only way to keep from getting in trouble was to blame Petitioner for what they did. Their history of drug abuse and stealing gave them a strong motive to lie about what actually happened with Petitioner.

The misconduct of the prosecutor and police officer show how weak and unreliable the statements of the victims were. They concluded early on Petitioner was a bad guy and had to be convicted, so they manipulate the evidence and charges to make sure Petitioner had to plead guilty and could not challenge the weaknesses in the victims' statements.

In Petitioner's case the importance of the insanity defense cannot be ignored. Petitioner had a Statutory and Constitutional right to present a credible defense, a defense established in Dr. Col and Dr. Blackwood's reports. Therefore, Petitioner requests the court set aside his plea and convictions and dismiss the case, or in the alternative, set aside his plea and convictions and order a new trial, or at a minimum have a hearing where the victims statements can be challenged on their credibility, and the prosecutor and police officer can be challenged on their motives and conduct, and Dr. Blackwood and Dr. Col can testify to whether Petitioner knew the acts he was accused of committing were wrong.

Respectfully submitted this 16th day of November 2020.

_____

Anders V. Rosenquist
*Attorney for Petitioner*

Filed this 16th day of November 2020,
with the Clerk of the Superior Court, Div. 1,
Post-Conviction Relief Management Unit.

-26-

ALLISTER ADEL
MARICOPA COUNTY ATTORNEY
Daniel Strange
Deputy County Attorney
Bar ID No. 022716
Firm ID No. 00032000
225 W. Madison Street, Third Floor SE
Phoenix, AZ 85003
Telephone: (602) 506-7422
appeals@mcao.maricopa.gov
Attorney for Plaintiff

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| STATE OF ARIZONA, | No. CR2016-000667-001 |
| Plaintiff, | |
| v. | **RESPONSE TO PETITION FOR POST-CONVICTION RELIEF** |
| ERNEST JOSEPH LONGHINI III, | |
| Defendant. | (Rule 32 Management Unit Honorable Dewain Fox) |

The State of Arizona, through undersigned counsel, opposes the petition and asks the Court to summarily dismiss it, pursuant to Rule 33.11(a), Ariz. R. Crim. P., for the reasons set forth in the following memorandum.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    FACTUAL    BACKGROUND    AND    PROCEDURAL HISTORY.[1]

On June 14, 2016, police began investigating Defendant due to allegations that he was trading methamphetamine and heroin in exchange for sexual favors with underage girls.

On July 7, 2016, police set up surveillance of Defendant's residence which he shared with his mother and brother (Karyl Bishop and Robert Turner). Police also received information that a sixteen-year-old runaway, Victim A, was at the residence and staying with Defendant. The police contacted Robert Turner and he told them Victim A was inside the house and he saw her walking from the bathroom to Defendant's bedroom wearing only a bath towel. He had also seen used condoms and condom wrappers on the floor of Defendant's bedroom. He believed Defendant was supplying Victim A with drugs and alcohol and that they were having sex. He did not like it because his brother was thirty years old. Police had also gone through

---

[1] The factual history is contained in the Pre-Sentence Report filed April 23, 2019.

2

the trash of the residence and found condom wrappers and syringes with a brown liquid that tested positive for an indication of heroin.

Later in the afternoon, police observed Victim A running away from Defendant's residence and contacted her. She told them that earlier in the day Defendant told her he would get her heroin if she masturbated him. After she did this, Defendant left on his bicycle to get the heroin. When he returned, he injected the heroin after failing to find a vein numerous times. The syringe he used on her was on the floor of his bedroom.

As a result of this information, the police attempted to contact Defendant, but he refused to exit his residence. After many announcements over a loudspeaker, Defendant finally gave up, exited the residence through his bedroom window and was taken into custody. A search of Defendant's residence revealed numerous items of drug paraphernalia (syringes, spoons, and a digital scale), condoms, and computer equipment (laptops and electronic storage devices).

The police interviewed Victim A at the police station, and she told them Defendant was a resource for her drug addiction. She described him as a thirty-year-old pervert that helps her and her friends because they are young girls. He would give her and her friends heroin

3

and sometimes he would inject them with it. Sometimes she would have to perform oral sex on him or masturbate him to get heroin from him (Count 5). Victim A recalled that in February 2016 she had gotten high and fell asleep. When she woke up, Defendant had taken her pants off and was kissing the inside of her thighs. She did not know if he had performed oral sex on her. This incident scared her, so she and her mother reported it to the police. The last time she had to perform a sex act on him was earlier today, as she had discussed when initially contacted by the police. He would often trade his methamphetamine for some heroin to give to her or he would just buy some, but he also provided her with methamphetamine in the past. Victim A began using heroin at the age of thirteen, but the first time Defendant injected her with heroin was when she was fifteen years old. He knew how old she and her twin sister (Victim B) were from the time they were introduced to him by Victim D. She stated that three times in the last month while they were driving in a car, Defendant would make her perform oral sex on him while they went to get drugs (Count 7). He would also withhold heroin or threaten not to get her any if she did not perform oral sex on him. There was another time after she had turned sixteen that he digitally penetrated her vagina while in his car (Count 16).

4

Victim A also told police that both of her sisters, Victims B and C, were present when Defendant injected her and that he had injected all three of them at some point along with Victim D. Victim C never had to do anything sexual, but Victim B told her she had also performed oral sex on Defendant and masturbated him. Victim A also saw pornography playing on Defendant's laptop all the time while in his bedroom. There was another time that he intentionally masturbated in front of her. Victim A then agreed to be examined by a SANE nurse.

When questioned by police about what happened that day, Defendant told them that Victim A showed up at his residence and told him to get some needles from another subject. He left on his bicycle and got the needles and came back home. He then injected her with heroin, but it took him several times to find a vein. Defendant estimated he had injected her with heroin ten to fifteen times since meeting her. He admitted to performing oral sex on her and also having her masturbate him (three times) but not in exchange for heroin; rather, after he made her feel guilty for all the times she had promised to but never did. He also admitted to receiving oral sex (three times) from her while in a car but only after she had gotten the heroin. However, there were times he did tell her she would not get heroin unless she did

5

something. They would then get into an argument, but he eventually gave her the heroin.

Defendant was also questioned about his involvement with Victim A's twin sister, Victim B, and he blamed them both for "playing" him. He fell in love with Victim B first and later Victim A. He denied having sex with either one of them or their older sister, Victim C. When he first met the twins (Victims A and B) he was told they were seventeen but later found out they were thirteen or fifteen. He did not know about their true age until he was already in love. Defendant admitted that the twins had given him oral sex and masturbated him the same number of times. He also admitted to digitally penetrating Victim A until she told him stop. He told police he helped to inject Victim C with methamphetamine, and he injected Victim B once with drugs.

On July 11, 2016, the police interviewed Victim C and she told them that she and her younger sisters (Victims A and B) were getting methamphetamine and heroin from Defendant. All three of them would go to his house and use drugs. She never did anything sexual for drugs but believed her sister, Victim A, did. She was first introduced to Defendant by her sisters in January 2016. Her sisters were getting heroin from Defendant and she saw him giving heroin to Victim A. At

6

first, he would give them drugs just to hang out with him. Victim A told her at one-point Defendant gave her twenty dollars to buy heroin after she took off her shirt and laid on top of him. If he did not have any heroin, he would also give Victim A money to buy some. This occurred sometime around March or April. Victim C was a methamphetamine and heroin user and mainly got her methamphetamine from Defendant but also from another subject. She indicated Defendant was also involved in organized retail theft and that she would use her identification to return stolen merchandise. The first time Defendant gave her methamphetamine, it was in a glass pipe. Defendant also injected her with methamphetamine for the first time because she did not know how to do it (Count 30). He then injected her many times with methamphetamine and sometimes he would do it multiple times in one day. Victim C was seventeen years old when he was injecting her with methamphetamine. She also witnessed Defendant inject Victim A with heroin numerous times and ask her sisters for sex. She also saw text messages about sex on Victim A's cell phone, and Defendant knew how old Victim A was because she had told him.

7

On July 13, 2016, the police interviewed Victim B and she told them that she first met Defendant when she was fourteen, which is when she started using heroin. She and her twin sister were introduced to Defendant by Victim D. At first, she only smoked heroin but later injected it. She typically got her heroin from Defendant but also had another connection. Defendant supplied them with heroin to keep the girls around. She tried methamphetamine with Defendant, and she would also sell it for him to get heroin. She believed he was a child molester because one time she woke up at his house and he was trying to take off her pants (Count 28). Victim B believed there were other opportunities where she was probably sexually assaulted but was too high to tell what was going on. Other people have told her that while she was passed out, Defendant would fiddle with her shirt or pants. She was aware that her sister, Victim A, was doing sexual things with Defendant. She and Victim D would also send Defendant nude photos of themselves but nothing else. She was almost sixteen when she did this.

Victim B stated Defendant injected her with heroin for the first time in November 2015 and the last time in March 2016. He injected her more than fifty times during that time. Defendant would also make

8

her take her shirt off to get heroin. He also exposed his penis to her in the past and she once walked in on him while he was masturbating and using "tools" on himself. He also tried to touch her while naked, but she would not let him. Victim B also stated Defendant injected her with methamphetamine approximately twenty times, but she did not like methamphetamine. She was fifteen when he injected her with methamphetamine. He also told her to take off her clothes so that she could stay at his house and this happened probably more than she could count.

While Defendant was in jail, he received several calls from his mother, Karyl Bishop, between the dates of July 12, 2016 and July 14, 2016. In the calls, Defendant asked his mother to go to the Verizon store and have his cell phone remotely locked and "wiped." Both were aware that the phone was being held as evidence. His mother agreed to do it and believing it would remove the ability to have a case against Defendant. They were unable to erase the phone. In another call, Defendant and his mother discussed how the police have his cell phone and he asked her to report the phone as lost or stolen. She told him she tried the day before and she also tried to have the phone deleted.

9

On August 2, 2016, the police interviewed Victim D and she told them the following: She first met Defendant when she was fifteen years old and she had just recently turned eighteen. She was walking down the street when he asked for her number and this kind of "freaked" her out because it was "creepy" in the way he approached her but she gave him her number and later went to his residence with a friend. She had never used methamphetamine but tried it. Victim D was aware of Defendant touching the twins (Victim A and B) and making them do stuff with him. When she was sixteen, she and her boyfriend went to Defendant's residence and Defendant pulled out his penis and exposed himself to them. She was also "creeped" out by the sex toys in his room. Her drug of choice was heroin and she knew Defendant bought heroin for the twins. He never sold her heroin, but he would give her the money to buy it. Defendant would also give her methamphetamine (about ten times) but he never injected her with it. She would smoke it with him and Victim C. Victim D also smoked heroin at Defendant's residence and she once saw Defendant inject Victim C with methamphetamine while in a car. Defendant had also given her heroin four times (Count 35).

10

On September 8, 2016, Victim B informed police that Defendant had been contacting her through Facebook and asked her to recant her statement to law enforcement. A search warrant was obtained for Defendant's Facebook account. A review of his account showed there was contact between them.

Defendant was indicted on forty counts on September 21, 2016. (Indictment filed 9/21/16 at 1-4.) After trial counsel filed a Rule 11 motion, Defendant's competence to assist counsel with his defense was stipulated to by the parties after the preparation of written reports by two doctors. (M.E. 2/28/17 at 2.) Then, on February 7, 2019, Defendant pled guilty to six counts pursuant to a plea agreement. (M.E. 2/7/19 at 2.) The agreement stipulated that defendant would be sentenced to prison for a term between 5 and 12.5 calendar years to run consecutively to another term of 13.5 calendar years. (Plea Agreement filed 2/7/19 at 5.) Upon his release from the prison terms, Defendant would be placed on supervised probation on the remaining four counts. (*Id.* at 5-6.) On April 23, 2019, Defendant was sentenced to a total prison term of 20.5 years with probation tails as set forth in the plea agreement. (Order of Confinement filed 4/23/19 at 1.)

11

Defendant filed a timely notice of post-conviction relief ("PCR") on May 23, 2019. Subsequently, on November 16, 2020, Defendant filed the instant petition claiming that: 1) Defendant's right to present a guilty except insane defense was violated, 2) Defendant's right to confront his accuser's was violated, 3) the prosecutor committed prosecutorial abuse of power, 4) the plea was defective, and 5) trial counsel rendered ineffective assistance by failing to a) raise Defendant's mental health in litigation of the case and b) ensure Defendant fully understood the alternative courses of action available to him. This is the State's response.

## II.    STANDARD/SCOPE OF POST-CONVICTION REVIEW.

To be entitled to any relief, a defendant must comply strictly with Rule 33 by asserting in his/her petition for post-conviction relief any one of the grounds listed in Arizona Rule of Criminal Procedure 33.1. *State v. Carriger*, 143 Ariz. 142, 146 (1984); *State v. Manning*, 143 Ariz. 139, 141 (App. 1984). This Court has no jurisdiction to rule on the merits of a petition for post-conviction review where no ground cognizable under Rule 33 is asserted. *Id.* Moreover, if a petition for post-conviction relief does not present a "material issue of fact or law which would entitle the defendant to relief" on any one of the grounds

12

set out in Rule 33.1, this Court must summarily dismiss the petition. *See* Ariz. R. Crim. P. 33.11(a). The Arizona Supreme Court has defined a colorable claim as one that has the "appearance of validity," such that "if the allegations are true, would they change the verdict?" *State v. Adamson,* 136 Ariz. 250, 265 (1983); *see also State v. Krum*, 183 Ariz. 288, 294–95 (1995) (holding no abuse of discretion for refusing to hold an evidentiary hearing where the defendant included affidavits that "lack[ed] any reliable factual foundation" and where defendant failed to come forward "with some substantial evidence" in support of his claim). In other words, a trial court may deny an evidentiary hearing if the allegations presented in the PCR petition "itself are vague and conclusory [or] wholly incredible." *Krum,* 183 Ariz. at 295. As with all grounds for post-conviction relief, the defendant has the burden of proving the allegations by a preponderance of the evidence. Ariz. R. Crim. P. 33.13(c); *State v. Verdugo*, 183 Ariz. 135 (1995). To satisfy that burden of proof, the defendant must present evidence of a "provable reality, not mere speculation." *State v. McDaniel*, 136 Ariz. 188, 198 (1983).

13

## III.    PRECLUSION.

Rule 33.2 is a rule of preclusion that is "designed to limit review and prevent endless or nearly endless reviews of the same case in the same trial court." *Stewart v. Smith,* 202 Ariz. 446, 450, ¶ 10 (2002.) Rule 33.2(a)(1) precludes post-conviction relief on claims that have been "waived by pleading guilty or not contest to the offense".

"It is well established that entry of a valid guilty plea forecloses a defendant from raising nonjurisdictional defects." *State v. Hamilton,* 142 Ariz. 91, 94 (1984) (citations omitted). By entering a plea of guilty, a defendant waives all non-jurisdictional defenses and defects occurring prior to the plea. *State v. Moreno,* 134 Ariz. 199, 200 (App. 1982). The waiver of non-jurisdictional defects includes deprivations of constitutional rights. *Tollett v. Henderson,* 411 U.S. 258, 267 (1973) (explaining that a guilty plea represents a break in the chain of events which has preceded it in the criminal process; when a criminal defendant, on advice of counsel, has solemnly admitted in open court that he is guilty of a charged offense, he may not thereafter raise independent claims relating to deprivation of constitutional rights that antedated plea). The entry of a guilty plea also waives all claims of ineffective assistance of counsel, other than claims of ineffectiveness

14

related to the validity of the plea upon which the conviction rests. *State v. Quick*, 177 Ariz. 314, 316 (App.1993).

In this case, there can be no doubt that Defendant voluntarily and intelligently waived his claims that: 1) Defendant's right to present a guilty except insane defense was violated, 2) Defendant's right to confront his accuser's was violated, 3) the prosecutor committed prosecutorial abuse of power, and 4) trial counsel rendered ineffective assistance by failing to a) raise Defendant's mental health in litigation of the case and b) ensure Defendant fully understood the alternative courses of action available to him.[2] The agreement specifically advises that:

---

[2] "To establish prejudice in the context of a plea agreement, a defendant must show a reasonable probability that except for his lawyer's error he would not have waived his right to trial and entered a plea." *State v. Banda*, 232 Ariz. 582, 585, ¶ 12 (App. 2013) (*quoting State v. Ysea*, 191 Ariz. 372, ¶ 17 (1998)). In his discussion of his claim that trial counsel rendered ineffective assistance to counsel by failing to ensure Defendant fully understood the alternative courses of action available to him Defendant seems to claim that he was unaware of the possibility of alleging a defense of guilty except insane prior to entering the plea. However, he only asserts that had he known about the defense "he **could** have elected to go to trial." Defendant's Petition at 24 (emphasis added.) In fact, Defendant repeatedly argues that circumstances unrelated to a possible GEI defense made the plea his only tenable option, undercutting any assertion which may be raised in the future that Defendant would have rejected the plea had he known about the affirmative defense.

15

> Unless this plea is rejected by the court or withdrawn by either party, the *Defendant hereby waives and gives up any and all motions, defenses, objections, or requests that he has made or raised, or could assert hereafter,* to the court's entry of judgment against him and imposition of a sentence upon him consistent with this agreement.

(Plea agreement, ¶ 6.) In addition, at the change of plea proceeding, Defendant avowed to the trial court that he read and understood the agreement, and placed his initials next to each paragraph, including ¶ 6 which contained his express waiver. (R.T. 2/7/19 at 4-5.) Thus, Defendant is precluded from relief under Rule 33.2(a)(1) because he waived these claims when he validly entered into the plea agreement.

## IV.   ARGUMENTS.

In his only non-precluded claim, Defendant alleges that his plea was defective because it was not knowingly, intelligently, and voluntarily entered. (Defendant's Petition at 24.) This claim is based on his assertion that Defendant was coerced into accepting a plea. Specifically, he alleges that "the prosecutor and police officer ... conspire[ed], tacitly or otherwise, to force a plea" and that "the prosecutor kept the defense from challenging the credibility of the victims before Defendant had to enter a plea." *Id.* However, the prosecutor's decision to file charges which would be proven almost

16

exclusively by victim testimony and the limitations imposed on pre-trial interviews by the Victim's Bill of Rights, do not constitute the type of coercion which would render Defendant's plea involuntary.

At the change of plea, the trial court complied with Arizona Rule of Criminal Procedure 17.2, which ensures that the plea is entered voluntarily, intelligently, and knowingly. *State v. Rose*, 231 Ariz. 500, 505, ¶ 13 (2013). During the proceeding Defendant was advised as required by Rule 17.2 and he agreed that he entered the pleas "because [he] thought about it and made up [his] own mind of [his] own free will to do it." (R.T. 2/7/19 at 14.) Statements made by a defendant during a plea colloquy are presumed to be true, although that presumption may be rebutted by adequate representations. *State v. Leyva*, 241 Ariz. 521, 525-26, ¶ 12-13 (App. 2017) (citing *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977)). However, the representations made in this case are far from adequate to overcome the presumption. Ultimately, "a challenge to plea proceedings is subject to summary dismissal when based on "conclusory allegations unsupported by specifics" or on "contentions that in the face of the record are wholly incredible." *Id.* at 526, ¶ 13. Here, Defendant provides no legal basis in support of his claims that the State did anything improper which forced him to take a plea. It was

17

simply the best of his options which he, apparently, now regrets. The record makes it clear that Defendant's choice to plead guilty was knowing, intelligent and voluntary and there was nothing improper in the actions Defendant seems to claim coerced him. Therefore, this claim should be summarily dismissed.

## V.    CONCLUSION

Defendant has failed to show any colorable claim entitling him to post-conviction relief under Rule 33. Therefore, the State requests that this Court summarily dismiss the petition for post-conviction relief.

Submitted December 28, 2020.

> ALLISTER ADEL
> MARICOPA COUNTY ATTORNEY
>
> BY /s/ Daniel Strange
>    Daniel Strange
>    Deputy County Attorney

The foregoing was e-filed and a
copy mailed\delivered this 28th
day of December 2020, to:

The Honorable Dewain Fox
Judge of the Superior Court

Anders V. Rosenquist
Rosenquist & Associates
42104 N. Venture Drive, Ste. A122
Anthem, AZ  85056
Attorney for Defendant


BY: /s/ Daniel Strange
       Daniel Strange
       Deputy County Attorney

19